2018 IL App (1st) 152242
No. 1-15-2242
Opinion filed September 28, 2018

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10 CR 14964 |
| LEONARDO GONZALEZ, | ) ) | The Honorable Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride specially concurred, with opinion.
Justice Burke dissented, with opinion.

**OPINION**

¶ 1    After a jury trial, defendant Leonardo Gonzalez was convicted of attempted first degree murder and aggravated battery with a firearm, for a shooting on July 3, 2010. Defendant was sentenced on June 25, 2015, to

concurrent sentences of 38 years and 10 years, respectively, with the Illinois Department of Corrections (IDOC).

¶ 2        On appeal, defendant raises numerous claims, including that his conviction and sentence for aggravated battery must be vacated under the one-act, one-crime rule, since the two offenses stemmed from the same shooting of the same victim. The State agrees.

¶ 3        Defendant's other claims include: (1) that the trial court improperly denied his right to present a defense by barring him from showing the tattoos on his hands to the jury where the tattoos would have further established the weakness of the State's eyewitness identifications, unless he waived his right to testify; (2) that the unreliable eyewitness identifications failed to prove beyond a reasonable doubt that defendant was, in fact, the shooter, where the police told the eyewitnesses, prior to their initial identifications that they had found the shooter and that his photo appeared in the photo spread given to them; (3) that his trial counsel was ineffective for failing to call numerous alibi witnesses; and (4) that the trial court erred in denying his motion for a new trial based on evidence of actual innocence.

¶ 4        For the following reasons, we reverse and remand for a new trial.

¶ 5                              BACKGROUND

¶ 6                               I. Pretrial

¶ 7          Prior to trial, the State made an oral motion *in limine* to exclude gang evidence. Defense counsel explained that the victim had admitted to being in a gang and had stated that he believed the shooter was also in a gang. However, counsel "agree[d] there should be no gang evidence [with] regards to" defendant. The ASA replied that the State did not intend to elicit any gang evidence. The ASA confirmed that the victim had stated to a detective that the victim was in a gang and believed that the shooter had also been in the same gang. However, the ASA clarified that the victim "indicated to [the ASA] that he does not know the defendant, and has never known the defendant prior to this incident." The trial court ruled that, if defense counsel tried to impeach the victim with his prior statement concerning gangs, then counsel will have opened the door to the State also to bring in gang evidence.

¶ 8                               II. Trial

¶ 9          The following facts were established at trial. On July 3, 2010, at some time after 1 a.m., the victim left a party, and his van hit a pothole, blowing out a tire, near Harding Avenue and 28th Street in the South Lawndale neighborhood of Chicago. He called his girlfriend, who arrived in her sport utility vehicle (SUV), which the two of them sat in while they waited for a tow truck. In the

rearview mirror, the victim observed a man looking inside his van. A second man approached, and the first man told the second man that there was a stereo in the van. The first man tried to open the van by reaching into the van through a window. The victim exited his girlfriend's vehicle and told the two men not to steal the stereo from his van. As the first man started backing away from the van, the victim walked toward it. The first man then lifted up his shirt with his left hand, pulled out a gun from his waistband with his right hand, cocked the gun with his left hand, and fired at the victim. When the shooting started, the victim was approximately six feet away from the shooter. After the victim was shot in his right hand three times, he ran and was shot in the leg and in the posterior. The two men ran off, and the victim's girlfriend drove the victim to the hospital.

¶ 10     At trial, the victim testified that he was 26 years old and had three felony convictions for (1) attempted residential burglary, in 2003, (2) burglary in 2004, and (3) criminal damage to government property, in 2012. On July 2, 2010, he was at a wedding party at his grandmother's house, where he consumed six beers. He stopped drinking by 1 a.m. on July 3, 2010.

¶ 11     The victim testified that, after leaving the party, his van hit a pothole near 28th Street and Harding Avenue, which was a residential neighborhood with streetlamps. It was "like three in the morning," so there were no other drivers

on the road. He parked his van on 28th Street, and there was a streetlamp right by his van, at the corner. After inspecting the broken wheel, he called both a tow truck and his girlfriend. When his girlfriend arrived 10 minutes later, she parked her SUV on Harding Avenue, about three houses or 50 feet away from his van, and he entered the passenger side of her SUV. While talking to his girlfriend and waiting in her SUV for the tow truck, he also kept an eye on his van by looking in the rearview mirror.

¶ 12    The victim testified that, after five minutes, he observed a man walk to his van and peer inside by the driver's side. Then this first man walked across the street towards a second man who was exiting from the rear of a house. The two men were talking loudly, and the victim had his window rolled down, and so the victim could clearly hear the first man state "there's a stereo in that car." The van's windows were rolled down, and the first person returned to the van and stuck "pretty much half his body" inside the van, through the passenger window. The victim could hear the first man trying to open the van's door from the inside. At this point, the second man was three feet from the first man.

¶ 13    The victim testified that he exited his girlfriend's SUV and approached his van. As the victim approached, both men looked toward him. The first man stopped leaning into the van, turned toward the victim, and was standing five or six feet away. In court, the victim identified the first man as defendant, who the

5

victim had "never" observed before. The victim testified that he told the first man: "this is my van. Don't steal it. Don't rob it. I live [nearby]." At that moment, the first man backed 8 or 10 feet away from the van, and the victim walked toward the passenger side of his van. The first man lifted up his shirt with his left hand, pulled a gun out of his waistband with his right hand, cocked it back with his left hand, and pointed it at the victim's abdomen. Before the first man fired, the victim placed his hands over his abdomen and was shot in his right hand three times. When the shooting started, the victim was six or seven feet away from the gun.

¶ 14    The victim testified that, after he was shot in his right hand, he turned and ran and was hit two more times, once in the leg and once in his posterior. The bullet in his leg exited through his lower stomach, while the second bullet, in his posterior, remained in his body. The first man fired a total of 10 to 12 times at the victim. The victim screamed that he was shot in the chest, in the hope that the firing would stop. After the victim observed the two men run away, the victim ran toward and entered his girlfriend's SUV, and she drove him to the hospital.

¶ 15    The victim testified that, when he first arrived at the hospital, he received morphine. During the 24 hours that the victim was at the hospital, he was visited twice by the Chicago police. During the first visit, the victim estimated

that his pain level was a 10, on a scale of 1 to 10, and he had to stop the conversation with the police.

¶ 16    The victim testified that, on August 5, 2010, he met with Detective Jose Gomez who showed him a photo spread. The victim identified the bottom left photo as a photo of the shooter and initialed and dated it. In court, the victim identified both "a lineup photo-spread advisory form" that he had signed[1] and the six-photo spread itself. On the next day, August 6, 2010, the victim was informed that the shooter had been arrested, and he and his girlfriend went to a police station to view a lineup. During the lineup, he identified the shooter as the second person from the left, who was wearing a jersey stating "Detroit." In court, the victim identified a set of photos as photos of the lineup and identified defendant as the person whom he had identified in the lineup.[2]

¶ 17    At the end of the direct examination, when asked if he was sure that defendant was the shooter, the victim replied:

"VICTIM: I'm 100 percent sure. I was only a couple feet away. I had a good glimpse of his tattoos and his face to—

---

[1]The advisory form was read into the record on redirect examination, so we provide its contents at that time.

[2]People's exhibit Nos. 3 through 6 were photos of the lineup. In the lineup, the other three men are all wearing black or white T-shirts and dark pants. Defendant is wearing a bright blue basketball tank top stating "Detroit 3" and a pair of shorts and is the only person with visible tattoos.

ASA: Rest at this time, Judge, with regards to this witness."

¶ 18       On cross-examination, the victim testified that, when the shooter cocked the gun with his left hand, the victim noticed that the shooter had tattoos on his arms. When asked whether the shooter had tattoos on his hands, the victim responded that he "was just focused on the ones on the arms." When defense counsel asked if the victim was focused on the left hand that had lifted the shirt and cocked the gun, he replied "yes." When counsel asked if the victim noticed any tattoos on the shooter's left hand, the victim then stated that he "was more focused on [the shooter's] face and his reactions to see if he would say anything." Counsel then asked, when the victim was focused on the shooter's face, whether he noticed an overbite. The victim testified that he did not notice an overbite because he was "concentrated on the face part." When counsel asked again whether the victim noticed any tattoos on the shooter's hands, he replied: "There were tattoos that I still can't distinguish like what they were."

¶ 19       On cross-examination, the victim testified that it took 10 minutes to drive to the hospital, and that he spoke to the police five minutes later. At that time, he told the police that the two men were Hispanic and that they were dressed in all black clothing, but he did not mention that the shooter had tattoos and a "shag" haircut. The victim explained that, in a shag haircut, the hair is long in back. Although the victim testified on direct examination that he received

morphine at the hospital, on cross-examination he testified that he did not know what medications he received at the hospital and he did not tell the police that he was on morphine.

¶ 20    On cross-examination, the victim testified (1) that he spoke to the police a second time on July 3, 2010; (2) that when the police asked him if his van had been rammed, he told them no; and (3) that when the police asked further questions, he replied that he did not want to speak to them anymore.

¶ 21    Later on cross-examination, when asked again about whether he told the police about tattoos, the victim replied: "I think I told him like there was some like I said on the arms." The victim also testified: "I could have mentioned that there was something on the hands but in the front of the hands but I didn't recognize what they are so I didn't say any." As to the tattoo that he recalled, the victim testified: "There was a letter A and some bunny ears on one of the arms." Defense counsel then asked his client to stand up, and the court stated: "Now we will have a sidebar." After the sidebar was held off the record,[3] the court ruled: "Objection's sustained." Thus, immediately after the victim described the shooter's tattoos, defense counsel asked defendant to stand up, and the jury heard the court prohibiting that action without any explanation.

---

[3]This issue was discussed again, on the record, at the end of the victim's testimony, and we quote that discussion below.

¶ 22    On cross-examination, the victim testified that the second time that he spoke with police on July 3, 2010, his girlfriend was also present in the room and she spoke with the police at the same time that he did. The victim testified that, during that second conversation, he believed he told the police that the shooter was wearing a "black shirt, beige something."

¶ 23    On cross-examination, the victim testified that, when he was in court last month, on April 1, 2013, he viewed People's exhibit No. 2, which was the photo spread. Counsel asked: "And when you saw that photo that's when you made the statement the shooter did have a shag, correct?" The victim replied: "Yes."

¶ 24    The victim testified (1) that, on August 6, 2010, he viewed a physical lineup; (2) that People's exhibit No. 6 is a photo of the lineup; and (3) that, in the photo of the lineup, defendant does not have a shag haircut. The victim testified: "I wasn't clear that the shag had to do with anything else. I was more focused on his face that's how I pointed him out by his face and by a haircut." The following colloquy ensued:

> "Q. But it was important enough for you to mention back on April 1st of 2013 last month, oh, I do remember that the shooter had a shag, correct?
>
> A. Yes.

Q. I can't hear you?

A. Yes.

Q. But it's not important now, correct?

A. It is important.

Q. And prior to April 1st, 2013, you had never told anyone in law enforcement that the shooter had a shag, did you?

A. No, I didn't because I didn't see one. ***."

¶ 25    The victim testified that, on August 5, 2010, when he viewed the photo array, the detective told him that he had found the shooter and that the shooter was in the photo array:

"DEFENSE COUNSEL: Now, back on August 5, 2010, when you went for the photo array, that's when you saw the six photos, you were contacted by a detective, is that correct?

VICTIM: Yes.

DEFENSE COUNSEL: And that detective told you he had discovered the person that shot you, right?

VICTIM: Yes.

DEFENSE COUNSEL: And they told you that you were going to see a photo array and the shooter was in that photo array, right?

ASA: Objection.

THE COURT: Overruled.

DEFENSE COUNSEL: Is that right?

VICTIM: Yes."

¶ 26     The victim testified that, before viewing the photo spread, a detective called him to ask if he was at home and if the detective could come over. The victim agreed, and after the detective arrived, the detective asked if the victim's girlfriend was there, and the victim replied that she was at work but he would call her. The victim informed the detective that his girlfriend should arrive in 30 minutes, so the detective waited, and the detective and the victim talked during this time. Defense counsel then asked:

"Q. And while you were talking to him for 30 minutes, at that time, that's when he told you he had identified who the shooter was?

A. Correct."

¶ 27     On redirect examination, the victim testified that, on August 5, 2010, he had the opportunity to read People's exhibit No. 1, which was the lineup photo spread advisory form, that it was also read aloud to him by the detective on August 5, 2010, and that the victim signed it. The form, which the ASA read into the record, stated in relevant part:

"I, [name], agree to view a lineup/photo spread at [address] on 5 Aug. 2010.

*I understand that the suspect may or may not be in the lineup/photospread.

I understand that I am not required to make an identification.

I do not assume that the person administering the lineup/photospread knows which person is the suspect."

¶ 28      On redirect examination, the victim also testified that the detective did not tell him who the shooter was, that the victim's girlfriend was not in the room when the victim viewed the photo spread, and that he was not in the room when she viewed the photo spread.

¶ 29      After the victim was excused from the stand and the jury was excused for lunch, the trial court and the attorneys held a conference about showing defendant's tattoos to the jury:

"THE COURT: All right. Now, at some point there was a request by the defense to have [defendant] stand and show his hands to the witness for the purpose of identifying or talking about some tattoos I'm not clear are on his hand. Why did you want to do that?

DEFENSE COUNSEL: I wanted, your Honor, to show that on [defendant's] left [ ]hand he has a tattoo which would have been evident

13

to [the victim] if he had viewed what he say[s] he described when he saw the person lift with his left [ ] hand a shirt[,] as well as in a cocking motion cock a [pistol], Judge, I believe that I should have been able to have [defendant] show his hand and let the jury see his hand, your Honor, the same way that he was identified by [defendant] as the person that shot him.

THE COURT: Okay. Well, the problem I have with this and the reason I didn't let you do it is because there's absolutely no way for the prosecution to cross-examine your client, when the tattoo was placed on [his] hand, how long he's had the tattoo, whether he had receipts for the tattoo so [defendant] wants to show his hand to the jury, he's going to have to do it from the witness stand so that the prosecution can cross-examine him about that which he's offering into evidence.

DEFENSE COUNSEL: Your Honor, just briefly, with regards to the photo lineups, your Honor, being the tattoos are in the lineup which [is] already in evidence.

THE COURT: Then that's something you can argue, but as far as him making any displays, they have got to be able to cross-examine and they can't if you do it that way."

¶ 30    In the discussion quoted above, where defense counsel argued that "the tattoos are in the lineup which [is] already in evidence," he was referring to People's exhibit Nos. 3 through 6, the photos of the lineup held on August 6, 2010, approximately a month after the offense. These photos show that defendant had tattoos across the width of both of his hands, and defense counsel was correct that these photos were already in evidence.[4] Defendant's hands were flat on his lap, so the photos provide a side or horizontal view of the tattoos. Since the hands were not photographed from above, one cannot discern exactly what the tattoos depict or precisely how eye-catching they were. However, the tattoos' existence, on the date of the lineup, was established and in the record, as defense counsel had argued to the trial court.

¶ 31    The victim's girlfriend, age 21, testified that on July 3, 2010, after 2 a.m., she received a call from her boyfriend, who stated that he had a busted tire and needed a tow truck. She then drove to 28th Street and Harding Avenue in her SUV, arriving "a little after three in the morning." The area was residential with street lights. After she parked on Harding Avenue, the victim entered the

---

[4]Toward the end of the trial, when the trial court and counsel were reviewing what exhibits had already been admitted into evidence, the trial court began: "Here's what I got, People's 1 through 13, admitted into evidence. Do you agree with that, [defense counsel], or not?" Defense counsel then indicated he agreed. Thus, there is no question that the photos were admitted, thereby establishing the tattoos' existence both at the time of identification and shortly after the offense.

passenger side of her SUV. As they were talking and waiting for a tow truck, she noticed that the victim became distracted, and that is when she noticed two men outside and she heard them say "something about a radio." When asked if she was able to view their faces, she replied: "Just their side face." In court, she identified defendant as one of the two men whom she noticed that night.

¶ 32    The victim's girlfriend testified that, after she noticed the two men, the victim exited her SUV and approached the two men. The victim stated that the van was his van and that he lived in the area. One of the men pulled out a silver gun from his shirt and started shooting at the victim. She heard at least eight shots and observed the victim run. She heard the victim state "my chest, my chest," and observed the two men run away. Then the victim entered her SUV, and she drove him to the hospital, which took less than five minutes. Still on July 3, 2010, but hours later, she spoke with the police at the hospital.

¶ 33    The victim's girlfriend testified that, on August 5, 2010, she viewed a photo spread at her boyfriend's house with Detective Gomez. Prior to viewing the spread, she viewed and signed an advisory form.[5] From the photo spread, she identified a photo of defendant as the shooter. In court, she identified People's exhibit No. 15 as the spread that she had viewed. She also viewed a

---

[5]The ASA reviewed the contents of the advisory form with her on redirect examination.

physical lineup, although she did not recall the date. From the lineup, she also identified defendant as the shooter.

¶ 34    The victim's girlfriend testified that, on July 3, 2010, when she was sitting in her SUV prior to the shooting and she observed the two men, she recognized defendant as someone with whom she had gone to high school. She did not know his name, but she recognized his face. However, when the police spoke with her at the hospital, she did not inform them that she had recognized the shooter because she was "scared because he had just shot [her] boyfriend so [she] knew he had a gun." She also did not tell the police when she met with them again to view the photo spread because she was still scared.

¶ 35    On cross-examination, the victim's girlfriend admitted that, the day before, she had stated that the reason she did not reveal she recognized the shooter was because she did not want her boyfriend to know that she knew the shooter. While she was driving the victim to the hospital, she also called the police. At the hospital, she spoke to her boyfriend while two police officers were present and asking questions. In court, she did not recall telling the officers that she had given her SUV to the victim's brother and that she had no way of contacting him. She also did not recall telling them that she did not recognize any of the people involved in the incident. She denied telling the officers that the shooter had either one or two companions with him. She did

recall telling the officers that she knew the shooter from high school so she was "a little shocked" the day before when the ASA did not know that. She also recalled telling the police, in the victim's presence, that the shooter wore a beige and black shirt. She did not recall the victim telling the officers that he did not want to talk to them any more after they asked if his van had been struck or rammed.

¶ 36    On cross-examination, the victim's girlfriend testified that, after the hospital, she did not speak to the police again for a month, until she met with them at the victim's house. When she was heading to the victim's house that day, she had no idea that the police were there. When she arrived, the victim was there with his grandmother, and two detectives were there, one of whom was named "Detective Gomez." All four were sitting in the living room of the single-family house. Prior to her viewing the photo spread, the detectives told her that they had identified the shooter and his photo was in the photo spread:

> "DEFENSE COUNSEL: [B]efore they showed you the pictures, they told you they had identified who the shooter was, right?
>
> A. Yes.
>
> Q. And they told you the shooter was going to be in the lineup in the photo array that you were going to see, correct?
>
> A. Yes.

Q. And then you were shown the photo array, correct?

A. Correct.

Q. And that's when you recognized [defendant] who you went to high school with, correct?

A. Yes.

Q. And that's who you picked out?

A. Yes."

However, she did not inform the police at that time that defendant had attended her high school, and she did not inform them the following day when she selected defendant from a physical lineup.

¶ 37    The victim's girlfriend testified that, between August 6, 2010, the date of the physical lineup, and "yesterday's date," which was May 7, 2013, she did not speak to the police. She testified, that prior to May 7, 2013, she had not informed the police that she recognized defendant from school.[6] The two men involved in the incident wore T-shirts, and she was not sure whether she told the police that one of them had tattoos. Periodically, the police would call her to give her updates about the case, and every time the police called, she would

---

[6]This testimony contradicted her earlier testimony on cross when she testified that she *did* recall telling the officers that she knew the shooter from high school and, thus, she was "a little shocked" the day before when the ASA did not know that.

speak to the victim about the incident and the men involved in it. However, she did not inform her boyfriend that she knew defendant from high school until sometime shortly after August 5, 2010. When she told him, she also stated to him that she had not told the police. The next time that she told someone, other than her boyfriend, was when she told the ASA on May 7.

¶ 38     On redirect examination, the victim's girlfriend testified that Detective Gomez showed her the advisory form before showing her the photo spread and that she read and understood it. The ASA read the advisory form into the record, and it stated in relevant part:

"I, [name], agree to view a lineup/photo spread at [address] on 5 Aug. 2010.

*I understand that the suspect may or may not be in the lineup/photospread.

I understand that I am not required to make an identification.

I do not assume that the person administering the lineup/photospread knows which person is the suspect."

Then the ASA asked "[a]t no point did Detective Gomez tell you that he already had the shooter in that photo array, correct?" and she answered "yes." However, on cross-examination, she had testified that there were two detectives present, and the ASA did not inquire about the other detective. Similarly, with respect to

the physical lineup, the ASA asked only whether Detective Gomez had stated that the shooter was in the physical lineup, and she responded that Detective Gomez had not. She testified that no one had told her who to select from the photo array or lineup.

¶ 39    On recross-examination, defense counsel inquired about the photo spread:

> "Q. You knew when you were having a conversation with the detectives on August 5, 2010, that you were going to participate in a photo lineup, correct?
>
> A. Yes.
>
> Q. And the police officers explained to you what you were about to do when you looked at the lineup, correct?
>
> A. Yes.
>
> Q. Yes?
>
> A. Yes.
>
> Q. When they explained that to you, they were explaining that to both you and [the victim]?
>
> A. Correct.
>
> Q. They told you they had identified the person who shot [defendant] on July 3, 2010, correct?

A. No.[7]

Q. They told you they wanted you to look at some photos, correct?

A. Yes.

Q. And they told you that you were going to sign on the photo of the person that shot [the victim] on July 3, 2010, right?

A. Initial.

Q. Initial, right?

A. Yes.

Q. And they told you all of that before you went into a separate room, correct?

A. Correct."

¶ 40    The State's next witness, Elizabeth Dawson, was an evidence technician with the Chicago Police Department who processed the crime scene on July 3, 2010, at 5 a.m. Specifically, she photographed the victim's green van and a nearby red vehicle and searched for firearm evidence, which she did not find. On cross-examination, she testified that she did not look for fingerprints on the green van. She looked for but did not find any bullet fragments or spent shell casings. She testified that, as she was sitting on the witness stand, she was

---

[7]This answer is in direct contradiction to the answer that the victim's girlfriend gave to the same question on cross that we quoted above. *Supra* ¶ 36.

currently wearing on her hip a semiautomatic weapon. Defense counsel asked her to demonstrate to the jury how she would cock a semiautomatic weapon, and then counsel stated: "So that the record is clear, could it reflect that with your right hand you made a forward movement with your right hand with your left hand on top of it in a backward position, going in a backward position." Dawson agreed, and she also testified that, if a semiautomatic weapon was fired, she would expect to find spent shell casings. She agreed that "the spent shell casing is the rear portion of ammunition or bullet in common terms."

¶ 41    The State's next witness, Detective Jose Gomez, testified that he had been employed with the Chicago Police Department for 21 years. Detective Gomez testified that, on August 5, 2010, he met with the victim at his residence for the purpose of showing him a photo spread. The victim also called his girlfriend and told her to come over "because [Detective Gomez] needed to talk to her." Both the victim and his girlfriend read and signed a lineup advisory form and selected defendant from the photo spread. Detective Gomez testified that the victim and his girlfriend viewed the spread separately. On August 6, 2010, the victim and his girlfriend also separately viewed a physical lineup at the police station and selected defendant from the lineup. Detective Gomez denied telling either the victim or his girlfriend that the detective had the shooter or knew who the shooter was.

¶ 42      On cross-examination, Detective Gomez testified that he spoke with the victim outside of his house and that he did not recall speaking with the victim's grandmother. When Detective Gomez finished speaking with the victim and finished showing him the photo spread, the detective asked the victim to contact his girlfriend and "have her come over." Thus, the victim's girlfriend knew why she was coming over, namely, because the detective "needed to talk with her."

¶ 43      On cross-examination, Detective Gomez testified that, prior to visiting the victim on August 5, 2010, he told him: "I'm going to show him some photo arrays and if he sees the person who shot him on the date [of] the incident I want him to pick him out." Detective Gomez testified that he was aware that the victim had been asked on July 3, 2010, about damage to the victim's vehicle and had refused to answer any further questions at that time. On August 5, 2010, the victim's girlfriend arrived in 10 to 15 minutes. When Detective Gomez testified that he could not recall what the victim's girlfriend had stated on August 5, 2010, the defense introduced defendant's exhibit Nos. 1 and 2, which were the two reports that Detective Gomez generated with respect to this investigation. Exhibit No. 1 was the case report, and exhibit No. 2 was a general progress report. After reviewing his reports, he testified that she did not inform him either on August 5 or August 6, 2010, that she had gone to high school with defendant.

¶ 44    Detective Gomez testified that the victim and his girlfriend arrived together at the police station on August 6, 2010, before viewing the physical lineup. Neither of them informed the detective that they recognized any of defendant's tattoos, and the girlfriend never informed him that she knew defendant.

¶ 45    On redirect examination, Detective Gomez testified that defendant was the only person in both the photo spread and the lineup. On recross-examination, he testified that he was aware that there were different ways to show a photo lineup and one of those ways is to show the photos one at a time instead of showing a group of photos as he did.

¶ 46    The State rested, and the trial court denied defendant's motion for a directed verdict. The defense called Detective Paul McDonagh, who testified that he had been employed with the Chicago Police Department for 16½ years. On July 3, 2010, after 3 a.m. he went to the hospital to interview the victim of a shooting. When Detective McDonagh arrived, the hospital staff were still working on the victim, and thus, the detective's conversation with the victim was "very limited." The victim stated the offenders were "two Hispanic males" dressed in black. The victim did not provide any information regarding either tattoos or a shag haircut. After speaking briefly with the victim, Detective McDonagh left the hospital and went to the vicinity of 28th Street and Harding

Avenue, where the offense occurred. While there, he spoke to individuals who identified themselves as witnesses. He also looked for firearm evidence and did not find any "expended cartridge casings." After returning to the hospital, Detective McDonagh had "information" that he had "learned pursuant to the investigation," and he confronted the victim with that information. One of the questions the detective asked was whether his vehicle had been rammed. The detective had found physical evidence of fresh damage to the victim's van. Once the detective asked that question, the victim ended the conversation.

¶ 47    Detective McDonagh testified that on July 3, 2010, he also spoke with the victim's girlfriend and asked her to provide a description of the offenders. She never told him that she recognized any of them or that one had gone to high school with her. She told him that she could not give him access to her vehicle because it had been given to the victim's brother and she had no way of contacting him. Neither the victim nor his girlfriend mentioned that the shooter had tattoos. The victim did not state that it was because of the morphine he received that he did not want to have a conversation. The detective's questions required only a one- or two-word answer, and the victim's answers were coherent. On recross-examination, Detective McDonagh testified that, when he spoke with the victim, the victim was receiving "a drip" that, based on his experience, is normally a saline solution with painkiller, "usually morphine."

The victim's girlfriend was crying and distraught. While at the crime scene, the detective was unable to obtain the names of any witnesses. The last question defense counsel asked was: "[Y]ou had learned pursuant to your investigation at the scene that the car had been rammed prior to shooting, correct?" The State objected, and the trial court sustained the objection. The defense then rested, and defendant did not take the stand.

¶ 48    After the jury was excused, defense counsel explained that Detective McDonagh indicated in his report that there was a witness who told the detective that the victim's vehicle had been rammed by a van and that three individuals exited their van and chased the victim around the vehicle while shooting at him. Defense counsel argued that this version contradicted the description of events testified to by the victim and his girlfriend. Although hearsay, defense counsel argued that he should have been able to ask about the victim's reaction when confronted with this information. The court ruled, "[N]o I don't think there was any way for you to get into what you got into. I gave you a great deal of leeway."

¶ 49    After closing arguments, the trial court provided detailed jury instructions, including that the jurors "should disregard questions and exhibits that were withdrawn or to which objections were sustained" and "should

27

disregard testimony and exhibits which the Court has refused or stricken."[8] In addition, the court instructed: "The evidence which you should consider consists only of the testimony of the witnesses and the exhibits which the Court has received." After listening to the jury instructions and deliberating, the jury found defendant guilty of attempted first degree murder and aggravated battery with a firearm.

¶ 50                                III. Posttrial Motions

¶ 51        On August 5, 2013, defense counsel filed a posttrial motion for a new trial that made mostly boilerplate claims, such as that the State failed to prove defendant guilty beyond a reasonable doubt. One of the few nonboilerplate claims, which was made with an eye toward sentencing, was that defendant "has no criminal record."

¶ 52        On February 3, 2014, defense counsel filed an amended posttrial motion for a new trial that claimed, among other things, that on December 11, 2013, defense counsel had discovered new evidence of actual innocence that could not have been discovered earlier. Attached to this motion were the affidavits of two witnesses who averred that at a small "get together" on April 3, 2013, they overheard the victim state that he had been shot but "that the person that had

---

[8]Similarly, prior to trial, the trial court instructed the jury, including that it "will decide the disputed issues of law that arise during the trial" and that "[i]f an objection to a question is sustained, you should not guess at what the answer might have been."

been locked up for it was not the person that shot him" and "that the friends of the person that was locked up would have to give [the victim] money to drop the charges." One of the witnesses, Yesenia De La Cruz, averred that, in November 2013, she spoke with defendant's sister and asked the name of the victim in defendant's case. On December 4, 2013, De La Cruz called the other witness, Rosa Pliego, and on December 11, 2013, they visited defense counsel and swore out affidavits.

¶ 53    On April 30, 2014, defendant filed a *pro se* posttrial motion in which he claimed, among other things, that "I feel my lawyer *** took advantage of me because of my birth defect, I always was I Special Ed [*sic*] growing up in school." Attached to the motion was a letter by defendant in which he stated that he was "an innocent man," that he "was at home with my daughter [']n the whole family," and that he wanted to take a lie detector test.

¶ 54    On December 2, 2014, defendant engaged new counsel who submitted a supplemental posttrial motion for a new trial that claimed defendant received ineffective assistance of counsel for several reasons, including (1) that trial counsel failed to move either for a mistrial or to suppress the identifications after the victim and his girlfriend testified that the detective stated that the shooter was in the photo spread and lineup and (2) that trial counsel failed to introduce evidence of defendant's tattoos. Attached to the motion was an

affidavit from defendant in which he averred that he had taken special education classes from second grade through sophomore year of high school and that he has "the same tattoos on my hands today that I had on the date of the offense."

¶ 55    On March 10, 2015, defendant's new counsel filed a second supplemental posttrial motion claiming ineffective assistance of counsel for several reasons, including that his trial counsel failed to call three alibi witnesses,[9] that defendant's sister had provided defendant's trial counsel with an affidavit from one of the three alibi witnesses prior to trial, and that when defendant's sister attempted to retrieve the affidavit from counsel after trial, he denied knowledge of it.

¶ 56                              IV. Posttrial Hearing

¶ 57                               A. Defense Case

¶ 58    On defendant's posttrial motions for a new trial based on actual innocence and ineffective assistance of counsel, the trial court held a posttrial hearing on April 22, 2015. Defendant called seven witnesses. In sum, two witnesses, Rosa Pliego and Yesenia De La Cruz, testified that they heard the

---

[9]Defendant's appellate brief states that the motion included affidavits from the three alibi witnesses, but the affidavits are not attached to the motion in the appellate record. However, the record does have their testimony at the subsequent posttrial hearing.

victim talking at a party about how the person in jail for the offense was not the shooter and how the victim wanted money to drop the charges. Three alibi witnesses testified that defendant was at home at the time of the offense, and defendant's sister, Nancy Gonzalez, testified that she brought affidavits from the alibi witnesses to trial counsel prior to trial. The three alibi witnesses were Rosario Calderon, the grandmother of defendant's two daughters and the mother of his girlfriend, and Rosario's two sons, Julian Calderon and Victor Zea. The three witnesses testified that defendant, Julian, and Zea were at home playing video games during the night, at the time when the offense occurred. Rosario lived in a one-family house, and defendant, his girlfriend, and their daughters lived in the basement.

¶ 59     Defendant testified at the posttrial hearing that when he asked his trial counsel why he did not contact the alibi witnesses, trial counsel replied that they did not need them and he "got this beat." Defendant testified that, during the night of the shooting, he was at home watching his daughter but then she went downstairs and went to sleep and he stayed upstairs with his girlfriend's brothers playing video games. Defendant also testified that the tattoos on his hands were not gang tattoos but were his daughter's names and that he had these same tattoos when he was arrested. The parties stipulated that the tattoo on defendant's right hand was 4½ inches by 2 inches and stated "Nevaeh" with

a heart on top of the "v"; and that the tattoo on his left hand was 3 inches by 1½ inches and stated "Alani."[10]

¶ 60                                    B. State's Case

¶ 61        In response, the State called defendant's trial counsel, who denied that defendant's sister gave him affidavits and explained that he decided not to introduce evidence of the tattoos on defendant's hands for fear that it might open the door to gang evidence.[11] With respect to the tattoos, counsel testified: "It was my belief that if we put in tattoos on his hands, that could possibly open up the door to other gang evidence." On cross-examination, trial counsel testified that he recalled that defendant had a tattoo on one hand but did not recall whether defendant had tattoos on both hands. He did not approach the State or file a motion *in limine* seeking to prohibit the State from introducing gang evidence if he introduced evidence of the hand tattoos on the ground that this was solely a matter of identification.

¶ 62        Trial counsel testified that he learned from reading police reports that defendant had told the police when he was arrested that he was at home during

---

[10]According to both the presentence investigation report and defendant's testimony at the posttrial hearing, Nevaeh and Alani are the names of defendant's two daughters. "Nevaeh" is "heaven" spelled backwards.

[11]This made limited sense, since the tattoos on defendant's hands were the names of defendant's two daughters. In addition, defense counsel did, in fact, try to introduce evidence of defendant's tattoos when he asked defendant to stand for the purpose of displaying them to the jury.

the evening of the offense "taking care of his child at his child's mother's residence."[12] While trial counsel did meet prior to trial with Nancy Gonzalez, defendant's sister, he denied that she gave him affidavits from other possible witnesses at that time or that he was ever informed, prior to trial, that defendant had an alibi for the night of the offense that he was at home playing video games.

¶ 63        Trial counsel testified that the only possible alibi defense that he was told about was by defendant and the alibi was that defendant "was with his child's mother's mother that evening. That they were having a relationship and smoking marijuana." By "relationship," he testified that he meant "a physical, sexual relationship."[13] Trial counsel told defendant that the alibi was not "believable." Defendant provided counsel with the grandmother's telephone number and asked trial counsel to contact her. "The next day or the day after," trial counsel placed a phone call and did not receive a reply. He testified that the grandmother, Rosario Calderon, also did not call him. Trial counsel testified that he did not pursue this line of defense because of defendant's prior statement to the police and because of a prior "statement by his children's mother that indicated that he had not been there and something to the effect they [sic] she had not seen him on that day or a few days prior to." When trial

---

[12]Defendant also lived in the same house.
[13]At the posttrial hearing, defendant denied ever telling counsel this.

counsel was asked on cross-examination how defendant's prior statement that he was at home conflicted with an alibi that he was at home, counsel replied that it conflicted with the girlfriend's statement. However, trial counsel did not explain and was not asked how the girlfriend's statement that she had not observed defendant that day or a few days before conflicted with an alibi that defendant was at home that night. Counsel did testify: "I did not believe the veracity of what he was telling me."

¶ 64      Trial counsel testified that, at a posttrial court appearance, Rosario Calderon, the grandmother of defendant's daughters, accused him of not returning her telephone calls. On direct examination, he testified that he tried to call her once. On cross-examination, he testified, "[o]nce or twice," and then testified that he was "not sure how many phone calls [he] made." The State also called Rosario Calderon, who testified that she called trial counsel twice prior to trial and that he never contacted her.

¶ 65                                    C. Ruling

¶ 66      The trial court denied the posttrial motions. In denying the motions, the trial court made a number of observations, including that "the jury had more than ample time to observe what counsel calls—what is already in the record as the size of the tattoos on his hands" and that "just sitting there, you can see the

tattoos."[14] In effect, the trial court found that the jurors had considered defendant's hand tattoos, despite the trial court's express instruction to them *not* to consider any exhibits "to which objections were sustained."

¶ 67    With respect to the alibi, the trial court found that "these three witnesses established an alibi for the defendant that would have put him in the house on [a certain street] at the time of the shooting." However, the trial court observed that the alibi contradicted a statement that defendant's girlfriend "apparently" made to the police that defendant was not "at the house" and contradicted defendant's statement that he was at home watching his daughter.[15] In addition, trial counsel testified that he was not told that defendant was playing video games but that he was having sex and smoking marijuana with his daughters' grandmother, which was a story that counsel found unbelievable.

¶ 68    The trial court found that "the video game alibi was a good alibi" but that "it would be strategically very risky thing to do knowing that it is going to be

---

[14]In its ruling on the posttrial motions, the trial court did not explain how the jurors were supposed to know that they were free to consider this evidence, after the trial court had barred it in front of them and then instructed them to disregard any evidence "to which objections were sustained." Immediately after the victim had described the shooter's tattoos, defense counsel asked defendant to stand up, and the jury heard the court prohibiting defendant from showing his tattoos.

[15]The State's "Answer to Discovery," filed February 13, 2013, states that defendant's girlfriend made a written statement that was provided to defendant in open court and that police reports were also provided in open court. However, the appellate record contains neither her written statement nor police reports.

shot out of the water by Chicago police officers" who spoke earlier to defendant and his girlfriend.

¶ 69    With respect to Rosa Pliego and Yesenia De La Cruz, who testified that they heard the victim talking at a party about how the person in jail for the offense was not the shooter and how he wanted money to drop the charges, the trial court found that it reflected poorly on their credibility that they waited to report what they had heard. The trial court observed that the party occurred three weeks before trial but they did not come forward with this information until after trial. The trial court found this information should have led to "a mad dash to the lawyer's office to get the lawyer to stop the imminent trial."

¶ 70    After reviewing the evidence, the trial court denied the posttrial motions for a new trial.

¶ 71                        V. The Sentencing

¶ 72    On June 25, 2015, defendant's new counsel filed a third supplemental posttrial motion, in which he claimed that the State failed to prove great bodily harm. The jury instructions stated that the State had charged that, during the commission of attempted first degree murder, defendant had personally discharged a firearm that proximately caused great bodily harm.

¶ 73    On June 25, 2015, the trial court denied the third supplemental posttrial motion and proceeded to sentencing. After hearing from three witnesses in

mitigation and listening also to factors in aggravation, the trial court sentenced defendant to 38 years with IDOC for attempted murder and 10 years for aggravated battery, to run concurrently. Defendant immediately filed a motion to reconsider sentencing, which was denied. On June 25, 2015, defendant filed a notice of appeal, and this timely appeal followed.

¶ 74                                         ANALYSIS

¶ 75            Since the evidence in this case was closely balanced and we find that the trial court did err in ruling that defendant could not offer evidence of his tattoos without testifying, and where the trial court failed to consider the testimony of Yesenia De La Cruz and Rosa Pilego, we remand for a new trial.  We find that the tattoo evidence, together with the testimony of De La Cruz and Pilego, could reasonably change the result of the verdict in this case.

¶ 76                                         I. Tattoos

¶ 77            On appeal, defendant claims that the trial court erred in barring him from showing his hand tattoos to the jury without subjecting himself to cross-examination. In the case at bar, identification was the only issue, and defendant's only defense at trial was misidentification. The only evidence linking defendant to the offense were the identifications of the victim and his girlfriend, who did not tell the police initially that the shooter had any tattoos.

Defendant claims that barring the jury from considering the prominence, type, and size of his tattoos prevented him from offering a meaningful defense.

¶ 78    The trial court stated that it barred the display because the prosecution lacked the opportunity to cross-examine defendant as to when the tattoos were placed on defendant's hands. Thus, defendant's claim on appeal raises a purely legal question, namely, whether a display of tattoos is testimonial and subject to cross-examination, as the trial court found. While evidentiary rulings are generally within the sound discretion of the trial court, *de novo* review applies to an evidentiary question if that question concerns how to correctly interpret a rule of law. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001); *People v. Williams*, 188 Ill. 2d 365, 369 (1999) ("Where a trial court's exercise of discretion has been frustrated by an erroneous rule of law, appellate review is required ***."). An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009). By contrast, *de novo* consideration means that we perform the same analysis that a trial judge would perform. *People v. Schlosser*, 2017 IL App (1st) 150355, ¶ 28.

¶ 79    Simply put, the exception to the general rule of deference applies in cases where a trial court's exercise of discretion has been frustrated by the erroneous application of a rule of law. *Caffey*, 205 Ill. 2d at 89. Where "the only issue for

the reviewing court is the correctness of the trial court's legal interpretation, *de novo* review is appropriate." *People v. Risper*, 2015 IL App (1st) 130993, ¶ 33. Thus, *de novo* review applies to this claim. However, our result would be the same whichever standard we applied.[16]

¶ 80    A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense. *People v. White*, 2017 IL App (1st) 142358, ¶ 30 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 43; U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). The right is abridged by evidentiary rulings that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purpose the purpose that they are supposed to serve. *Holmes*, 547 U.S. at 324. Arbitrary rules are ones "that excluded important defense evidence but that did not serve any legitimate interests." *Holmes*, 547 U.S. at 325.

¶ 81    Defendant argues in his brief to this court that Illinois courts have long held that physical in-court demonstrations are not testimony, and the State does

_____

[16]Neither party on appeal has much discussion about the appropriate standard of review. The State assumes that the abuse-of-discretion standard applies.

not dispute this point of law.[17] *People v. Warmack*, 83 Ill. 2d 112, 126 (1980) ("no testimonial compulsion was involved" when the trial court forced the defendant to model certain clothing in front of the jury); *People v. James*, 348 Ill. App. 3d 498, 508-09 (2004) ("a tattoo was not testimonial in nature and the defendant's sixth amendment right to confrontation was not violated where a nontestifying codefendant's gang tattoos were displayed to the jury");[18] see also *Gilbert v. California*, 388 U.S. 263, 266 (1967) (compelling the defendant to provide handwriting exemplars did not violate his fifth amendment privilege against self-incrimination); *People v. Hayes*, 353 Ill. App. 3d 355, 360 (2004) (no error occurred when the trial court ordered the defendant to walk before the jury in order to demonstrate a limp); *People v. Speirs*, 231 Ill. App. 3d 807, 807-09 (1992) (no error occurred when the defendant was compelled to show the tattoo on his arm to the jury, after the victim testified that he recalled a tattoo on his attacker's arm).

---

[17]Although in its appellate brief the State "maintain[s] that the trial court's evidentiary rule was correct," it offers no discussion of statute or case law to support that assertion.

[18]See also *United States v. Hubbell*, 530 U.S. 27, 35 (2000) ("[A] criminal suspect may be compelled to put on a shirt, to provide a blood sample or handwriting exemplar, or to make a recording of his voice. The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief.").

¶ 82     In *People v. Davenport*, 301 Ill. App. 3d 143, 154 (1998), a police officer was allowed to testify to the gang significance of a tattoo on a co-defendant while the co-defendant was required to stand in the well of the courtroom and display his tattoo.  In that case of first impression in a trial which was conducted jointly before two juries, we recognized that the courtroom display of the co-defendant's gang related tattoos, was not testimony, and did not trigger Davenport's Sixth Amendment right to cross-examine the prosecution's witnesses because the co-defendant's body was used as an exhibit or demonstrative evidence. *Davenport*, 301 Ill. App. 3d 3d at 154.

¶ 83     In *People v. Speirs*, 231 Ill. App. 3d 807, 811 (1992), although not based upon the non-testimonial nature of the display, the appellate court held that the trial court properly required a defendant who was charged with aggravated battery to remove his jacket to reveal his tattoos on his arms which were similar to those described by the victim, since those tattoos were relevant to the issue of identification.

¶ 84     More recently, there is authority which suggests a defendant should be allowed to demonstrate or display his tattoos without providing testimony.  In *People v. White*, 2017 IL App (1st) 142358, ¶ 36, this court vacated the defendant's conviction and remanded for new trial where the trial court's erroneous limitation and exclusion of defendant's arm tattoos was not harmless.

Here, the trial judge did not have the benefit of the *White* decision when he ruled, nor was the issue in *White* the same as the one we are confronted with in this appeal. Since this specific issue has not been addressed directly in any other Illinois decision, it is this court's opinion that we should set forth a clear rule for trial judges to follow when confronted with a similar issue in the future.

¶ 85    Courts of other jurisdictions which have dealt directly with the issue of a defendant's request to display some physical characteristics without testifying have allowed such displays on the basis of due process. These courts have held that to permit the State the right to require a defendant to display some physical characteristic without allowing a defendant the same right to display a physical characteristic would violate that defendant's right to due process. See *State v. Martin*, 519 So. 2d 87, 90-93 (1988) (since defendant could have been compelled by the State to demonstrate any tattoos he had on his body, without violating his privilege against self-incrimination, as display would not be testimonial, defendant was entitled to show his tattoos or lack of them at trial where such display was material, without any cross-examination as to tattoo's origin); *U.S. v. Bay*, 762 F.2d 1314, 1315-17 (1984) (holding that it was error to refuse bank robbery defendant, who did not take the stand, to exhibit to the jury the tattoos on the backs of his hands, where on cross-examination, the teller at the bank testified that she did not remember anything unusual about defendant's

hands except that he had long fingers; the hand display would be relevant to other robbery counts where other tellers saw defendant do things with his hands and handed him money and, when asked what they remembered about the perpetrator's appearance, specifically including his hands, they did not mention any tattoos on the perpetrator's hands). Based upon all of the above, we find that a defendant's right to display a physical characteristic should not be conditioned upon a defendant's relinquishment of his Fifth Amendment right not to testify.

¶ 86        Like the introduction of any physical evidence, a foundation for that evidence is required. Therefore, the party offering a tattoo into evidence, to be published or displayed to the jury, has the burden to establish a foundation that the tattoo was placed on the defendant or viewed by others at the relevant time. Without such a foundation, a display of tattoos or a lack of tattoos would have no evidentiary basis.

¶ 87        In the case at bar, the trial court stated that it barred the display, for the following reasons:

> "Well, the problem I have with this and the reason I didn't let you do it is because there's absolutely no way for the prosecution to cross-examine your client, when the tattoo was placed on [his] hand, how long he's had the tattoo, whether he had receipts for the tattoo so [defendant]

wants to show his hand to the jury, he's going to have to do it from the witness stand so that the prosecution can cross-examine him about that which he's offering into evidence."

Not only is that ruling legally wrong as we discussed above, it was also factually problematic for the following reasons. The victim testified that he was "100 percent sure" that defendant was the shooter because he had "a good glimpse of his tattoos"—when the ASA cut off his answer. The lineup photos in evidence were not taken from above defendant's hands but from the front of his hands which were flat on his lap and, thus, show a two-dimensional or horizontal view of the tattoos. However, the hand tattoos are unmistakably there and unmistakably in evidence, as of the date the photos were taken, but not necessarily before that time. What is not in evidence is a good view of how eye-catching and prominent they are, and what they actually display. *People v. Minter*, 2015 IL App (1st) 120958, ¶ 95 (discussing another case, this court observed that "the defendant's tattoos were relevant to establish his identity because one of the State's witnesses identified him by the tattoos").

¶ 88      If the jurors were faithfully following the instructions given to them, and we have been given no reason to think that they were not, then the jurors were told specifically to disregard any evidence, "to which objections were sustained," such as the tattoos on defendant's hands. The trial court's ruling

44

caused the jurors, if they were following the instructions, to disregard this evidence.

¶ 89     When the trial court revisited the issue again during the posttrial hearing, the trial court found no error, finding that the tattoos were "obvious to the jury" and, "just sitting there, you can see the tattoos." Again, this assumes that the jurors considered the evidence that they had been explicitly told not to consider.

¶ 90     Apart from a defendant testifying himself, there are any number of ways of laying a proper foundation for the viewing of tattoos. Any witnesses who knew defendant could testify that he had the tattoos at or before the date of the shooting. A receipt or other business record from a tattoo parlor, if properly introduced, could also establish a foundation—all without subjecting defendant to cross-examination. Defendant concedes on appeal that he failed to preserve this issue for appeal. We find that the trial court's ruling, that defendant could not admit evidence of his tattoos without surrendering his right not to testify, constituted a clear and obvious error. Thus, the next question is whether this ruling rose to the level of plain error.[19]

¶ 91     When a defendant has failed to preserve an error for review, we may still review the issue for plain error. *People v. Sebby*, 2017 IL 119445, ¶ 48; Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be

---

[19]This court is not certain that this concession is correct, but we accept it for purposes of our analysis.

45

noticed although they were not brought to the attention of the trial court."). The plain error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error also threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). For the reasons already explained above, a clear and obvious error occurred. Thus, we next consider whether the evidence was closely balanced. To determine whether the evidence at trial was close, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 92    At trial, as we have explained, the State presented no evidence linking defendant to the offense except for the identifications by the victim and his girlfriend. The State offered no testimony that defendant was arrested at or near the scene of the crime. The State did not introduce a confession or any incriminating words or actions by defendant. The State presented no evidence that defendant tried to flee or avoid the police. The evidence technician testified that she recovered no gun or ballistics evidence from the scene. The State

offered no items found on or near defendant, such as ammunition. Although the victim testified that the shooter tried to enter the victim's van, inside and out, the evidence technician stated that she did not look for fingerprints. Immediately after the offense, the only description that the victim and his girlfriend provided was that the offenders were Hispanic men dressed in black—a description that could fit a vast number of men in the city of Chicago. The State provided no evidence or testimony of how the police came to select this particular Hispanic man to place in a photo spread. Defendant had no prior felony convictions and only three minor misdemeanors from years ago. In sum, there was no introduced link between defendant and the shooting except for the victim's and his girlfriend's selection of defendant from the photo spread and lineup shown to them.

¶ 93    While the identification of one eyewitness is enough to find that the evidence was sufficient to find defendant guilty beyond a reasonable doubt (*e.g. People v. Smith*, 185 Ill. 2d 532, 545 (1999)), the question for us at this juncture in our analysis is not sufficiency but whether the evidence was closely balanced. *Piatkowski*, 225 Ill. 2d at 566 ("[w]hether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction").

¶ 94        At trial, as we have explained, the State presented no evidence linking defendant to the offense except for the identifications by the victim and his girlfriend. The State offered no testimony that defendant was arrested at or near the scene of the crime. The State did not introduce a confession or any incriminating words or actions by defendant. The State presented no evidence that defendant tried to flee or avoid the police. The evidence technician testified that she recovered no gun or ballistics evidence from the scene. The State offered no items found on or near defendant, such as ammunition. Although the victim testified that the shooter tried to enter the victim's van, inside and out, the evidence technician stated that she did not look for fingerprints. Immediately after the offense, the only description that the victim and his girlfriend provided was that the offenders were Hispanic men dressed in black—a description that could fit a vast number of men in the city of Chicago. The State provided no evidence or testimony of how the police came to select this particular Hispanic man to place in a photo spread. Defendant had no prior felony convictions and only three minor misdemeanors from years ago. In sum, there was no evidentiary link between defendant and the shooting except for the victim's and his girlfriend's selection of defendant from the photo spread, the lineup shown to them and their in-court identifications.

¶ 95    Both eyewitnesses testified at trial that, prior to their initial identification from the photo array, the police told them (1) that the police had found the shooter and (2) that his photo was in the photo array. The witnesses were thereby encouraged to select the photo that *most resembled* the shooter rather than selecting a photo only if they were positive it was, in fact, the shooter. After the ASA led the victim's girlfriend through every line of the advisory form on redirect examination, she answered "no" on recross-examination when asked if the police told her that they had identified the person who shot the victim. However, it is unclear if this "no" referred to the form or to the prior conversation that she had already testified to because, when subsequently asked if the police *told* her that she *was* "going to sign" on the photo of the person who shot the victim, she replied affirmatively.

¶ 96    This error was compounded when defendant was the only person to appear in both the photo array and the subsequent lineup. Since the police told the witnesses that they had found "the shooter" and since defendant was the only person in both the photo array and the lineup, the only person who could have possibly been "the shooter," according to the police, was defendant, who was the only person to appear in both displays.

¶ 97    The police conduct in conducting the photo array and lineups may have undermined the reliability of the identification by the victim, who testified that

he had never observed either the shooter or defendant before. However, the day before trial, the victim's girlfriend volunteered to the authorities,[20] for the first time, that she recognized defendant from school. Thus, if believed, she had some independent basis for recognizing defendant. However, her view of the shooter was compromised, since she testified that she observed only the side of the shooter's face. She was sitting inside her vehicle rather than standing on the street as the victim had been.

¶ 98    We reverse and remand for a new trial. Based upon all the above, we find that the trial court erred in denying evidence of defendant's tattoos. The evidence of the tattoos, and the two additional witnesses who claim the victim admitted that defendant is not the person who shot at him, could possibly change the result in this case and meet the test for a new trial based upon actual innocence. *People v. Ortiz*, 235 Ill. 2d 319, 332 (2009) (to support a claim of actual innocence, the evidence must be newly discovered, material and not merely cumulative, and of such a conclusive character that it would probably change the result on retrial).

---

[20]As we discussed, she never told the police. She told the prosecutor the day before trial.

¶ 99                          II. Double Jeopardy

¶ 100        When a reviewing court remands for a new trial, it must consider whether

a new trial would violate double jeopardy. *People v. McKown*, 236 Ill. 2d 278,

311 (2010). If the evidence presented at the first trial could permit "any"

rational trier of fact to find defendant guilty, retrial is permitted. *McKown*, 236

Ill. 2d at 311; *White*, 2017 IL App (1st) 142358, ¶ 36 (observing "the minimal

standard for a sufficiency of the evidence challenge"). Since one eyewitness

identification can render a verdict simply sufficient, double jeopardy is not a bar

to a new trial. *E.g. Smith*, 185 Ill. 2d at 545 (the testimony of a single witness

may be sufficient to convict).

¶ 101                           CONCLUSION

¶ 102        For the foregoing reasons, we reverse and remand for a new trial.

¶ 103        Reversed and remanded with instructions.

¶ 104        PRESIDING JUSTICE McBRIDE, specially concurring:

¶ 105        Although I agree with the decision to reverse and remand for a new trial,

I do so for two simple reasons: (1) the trial court's denial of defendant's request

to present evidence of his tattoos was an error that was plain; the evidence was

closely balanced and defendant has carried his burden of persuasion that the

outcome of the trial would probably have been different if he had been allowed

to present this evidence (*People v. Herron*, 215 Ill. 2d 167, 178-79, 186-87

(2005); and, (2) the motion for a new trial based upon actual innocence should have been granted. It is the combination of these two rulings under the facts and circumstances of this case which undermines confidence in the outcome of defendant's trial and warrants a reversal and remand for a new trial.

¶ 106    Speaking first to the motion for a new trial, it is my opinion that defendant clearly established the evidence was new, material, non-cumulative, and likely to change the outcome on retrial. *People v. Molstad*, 101 Ill. 2d 128, 134-36 (1984). The most significant testimony presented on the claim of actual innocence at the hearing on defendant's multiple motions for a new trial, was that of Rosa Pilego and Yesenia De La Cruz. Both witnesses testified that they attended a party where the victim in this case, Mr. Montenegro, spoke about being shot and that the person in jail for shooting him, was not the person who actually shot him. Montenegro was also heard to say that he wanted money from that person's family and friends in order for him to drop the charges against that person. Thus, under *Molstad*, this evidence should have been scrutinized more closely to determine defendant's guilt or innocence. *Molstad*, 101 Ill. 2d at 136.

¶ 107    Considering the closeness of the evidence in this case, which I describe below, the outcome of the defendant's trial probably would have been different had the jury heard from these two witnesses. Finally, although, the trial court

rejected the new alibi testimony, based upon the claim of ineffectiveness of trial counsel, the hearing did disclose that there were other alibi witnesses available to testify at a new trial. It should also be noted that there was no conflict concerning these new alibi witnesses, because of a statement made by the mother of defendant's children. Her hearsay statement, which was actually never testified to but was made to a police officer shortly after defendant's arrest, could not be used to impeach another alibi witness's statement that defendant was with that person on the night of this shooting. The person to whom it was made, a police officer, if it was made, could not testify to this hearsay statement and it is doubtful that the mother of defendant's children would testify and possibly be impeached, when other alibi witnesses were available. In any event, the testimony of these two witnesses, Pilego and DeLa Cruz, regarding statements of the victim which indicated this defendant did not shoot the victim were, in themselves, sufficient to undermine confidence in the verdict at defendant's trial.

¶ 108        As to the presentation of the tattoo evidence, I agree, for the reasons cited above, that defendant should have been allowed to present this evidence without surrendering his right not to testify. However, it is also apparent from the record of the proceedings on defendant's motions for a new trial that defendant's sister would also have been available to testify that defendant's

tattoos were on his hands at or around the time of the commission of the offenses at issue here. Her testimony at that hearing established a sufficient foundation to show that the tattoos were on defendant's hands and in place at the time of the shooting. This testimony surrounding the placement of defendant's tattoos would also probably change the result on retrial. Further, any claim that this evidence would open the door to gang evidence is not supported by this record, because there is no question that the tattoos were the names of defendant's two daughters and nothing more. Consequently, there was sufficient evidence to show that a new trial should have been granted based upon what can only be described as a closely balanced case. Although the evidence presented at trial was enough to satisfy the sufficiency of the evidence argument on appeal, it is not enough to withstand the defendant's argument on his right to present his defense and whether he is entitled to a new trial on actual innocence grounds.

¶ 109    As to plain error, there is little doubt that the evidence in this case was closely balanced. Both eyewitnesses were impeached on numerous matters, their identifications were riddled with inconsistencies, and the victim of the shooting was a convicted felon. The prosecution's case also lacked corroborating physical evidence, or any incriminating statement of defendant. In addition, and very early on, the victim refused to answer questions posed by

police concerning what another unnamed eyewitness told police about this shooting, specifically whether prior to the shooting, the victim's vehicle was rammed by another vehicle, that three people—not two—got out of that other vehicle, and that they then chased the victim on the street and eventually shot him. This area of inquiry was not allowed to be explored by the defense even though it was completely contrary to the version of events testified to by the victim and his girlfriend, and even though there was evidence that a police officer noticed that the victim's vehicle appeared to have been recently damaged. Granted, this testimony was perhaps, inadmissible, but the testimony that an officer noticed recent damage to the victim's vehicle was not hearsay and these facts show that the victim was uncooperative and demonstrate further evidence concerning the victim's credibility.

¶ 110    Since we are remanding for a new trial, it is not necessary to address any of the defendant's other claims, in particular, the claim of ineffectiveness of trial counsel. Accordingly, I concur in the decision to reverse and remand for a new trial for the two reasons stated in this special concurrence.

¶ 111    JUSTICE BURKE, dissenting:

¶ 112    I write separately because I disagree with the majority's conclusion that the trial court committed reversible error in preventing defendant from showing his tattoos to the jury. Although the majority has not addressed the defendant's

claim of ineffective assistance of counsel due to the reversal on other grounds, I also write separately to address the ineffective assistance of counsel claim that was briefed by both parties.

¶ 113    The victim and his girlfriend testified for the State that on July 3, 2010, they were waiting for a tow truck in the girlfriend's SUV when two men approached the victim's nearby van. The victim approached the two men because he believed they were attempting to steal the stereo from his van. Defendant had been leaning inside of the van. Defendant pulled a gun out of his waistband when the victim was six or seven feet away him, and he shot the victim three times in the hand, once in the leg, and once in the posterior. The victim and his girlfriend testified that the streetlights provided enough light so that they could see clearly. The victim could see defendant's face and identified him as the shooter in a photo array, in a lineup, and at trial. He had never seen defendant before the shooting, but was sure defendant was the shooter because he got a good look at his face and the tattoos on his arms.

¶ 114    The victim's girlfriend also testified that she could see the sides of both men's faces from the SUV and identified defendant as the shooter in a photo array, in a lineup, and at trial. The victim's girlfriend also testified that she recognized defendant because they attended the same high school, but she acknowledged that she did not tell police that information. The victim told

police that there were two male offenders, both of whom were Latino, wearing black and beige clothing. The jury found defendant guilty of the charged offense.

¶ 115     Defense counsel filed a posttrial motion for a new trial alleging that there was newly discovered evidence of defendant's actual innocence. Defendant engaged new counsel who filed two supplemental posttrial motions. Defendant's new counsel alleged that defendant's trial counsel provided ineffective assistance by, *inter alia*, not introducing evidence of defendant's hand tattoos and failing to call three alibi witnesses.

¶ 116     The court held an extensive hearing on defendant's posttrial motions where defendant called seven witnesses. Two of the witnesses testified that they heard the victim state that the person who was "locked up" was not the person who shot him, and that he wanted money from that person's friends or family to drop the charges. Defendant also presented the testimony of three alibi witnesses who testified that defendant was at home playing video games at the time of the offense. Defendant's sister testified that she presented affidavits from these alibi witnesses to defendant's trial counsel prior to trial. Defendant testified that he asked his trial counsel about the alibi witnesses, but trial counsel told him that he did not need to call the alibi witnesses because he could win the case without them.

¶ 117    The State presented the testimony of defendant's trial counsel who testified that he did not present an alibi defense because the police reports indicated that defendant's girlfriend told police that defendant was not at the house that day. Trial counsel testified that the only alibi evidence he was presented with prior to trial was defendant's claim that at the time of the offense he was having sex with his children's maternal grandmother. Trial counsel did not present this alibi because he did not believe defendant was being truthful, and because it was contradicted by defendant's girlfriend's statement to police. Trial counsel testified that he had met with defendant's sister, but she had not given him any affidavits. Trial counsel also testified that he was never presented with any evidence regarding defendant being at home playing video games at the time of the offense.

¶ 118    Trial counsel also testified that he made a strategic decision to not introduce evidence of defendant's tattoos at trial because, based on the pretrial motion *in limine*, that would open the door for the State to present evidence of defendant's gang-related tattoos. He believed, however, that questioning the witnesses regarding whether they saw defendant's tattoos was relevant to defendant's defense.

¶ 119    The trial court denied defendant's posttrial motions finding that the testimony of the alibi witnesses that defendant was at the house playing video

games at the time of the shooting contradicted the statement defendant's girlfriend gave to police that defendant was not at the house that day. The court also noted that trial counsel did not find defendant's alibi, the only alibi he knew about prior to trial, believable. The court thus determined that it was reasonable for trial counsel to not present an alibi defense because of the State's opportunity for impeachment. With regard to defendant's tattoos, the court observed that the jury had the opportunity to observe the tattoos on defendant's hands throughout the trial, even though defense counsel did not present any evidence of them.

¶ 120 The court also rejected defendant's claim of actual innocence based on the testimony of two witnesses, noting that because they knew defendant, the court did not believe the two witnesses would wait to come forward until after the trial. Accordingly, the court did not find their testimony credible.

¶ 121 I disagree with the majority's conclusion that the trial court's comments that defendant could not introduce evidence of his tattoos without taking the stand and being subject to cross-examination constituted reversible error. The majority addresses this issue as an error of law subject to *de novo* review. I find that not only does the majority apply the incorrect standard of review, but the majority's analysis also confuses the issue. The majority presents the issue as whether defendant's demonstration would be testimonial. The issue identified

by the trial court, however, was one of foundation, an issue the majority touches upon only briefly and only after finding error.

¶ 122    Initially, the majority correctly recognizes that evidentiary rulings are generally within the sound discretion of the trial court, and that such rulings will not be reversed absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89-90 (2001). Without much explanation, however, the majority concludes that *de novo* review is appropriate in this case because "defendant's claim on appeal raises a purely legal question, namely, whether a display of tattoos is testimonial and subject to cross-examination." This, however, is mischaracterization of the trial court's ruling. The majority quotes from the trial court's comments, but ignores the substance of the statements. The trial court stated that:

> "Well, the problem I have with this and the reason I didn't let you do it is because there's absolutely no way for the prosecution to cross-examine your client, when the tattoo was placed on [his] hand, how long he's had the tattoo, whether he had receipts for the tattoo so [defendant] wants to show his hand to the jury, he's going to have to do it from the witness stand so that the prosecution can cross-examine him about that which he's offering into evidence."

¶ 123   Here, the court's comments identify the crux of the issue that the majority glosses over: foundation. The court's comments recognize that defendant has a right to not testify and he would not waive that right by showing his tattoos to the jury, *i.e.*, that demonstration would be non-testimonial. The court clearly states that if defendant were to show his tattoos to the jury "there's absolutely no way for the prosecution to cross-examine your client," that is, defendant is in "no way" subject to cross-examination merely by displaying his tattoos to the jury. The court's concern, however, was establishing a foundation for when the tattoos were placed on defendant's hands.

¶ 124   It is important to remember that, in this case, the shooting occurred on July 3, 2010. The victim and his girlfriend viewed a photo array with defendant's photograph on August 5, 2010, and viewed the lineup with defendant in it on August 6, 2010. The trial court acknowledged that defendant's hand tattoos were visible in the lineup photograph, but this cannot and does not serve as evidence that defendant had the tattoos on the night of the incident over a month prior.

¶ 125   Defense counsel was offering evidence of the tattoos to challenge the witnesses' identification. However, defendant's tattoos are relevant only if he had them on the date of the offense. Thus, based on how this issue was

presented to the trial court, defendant was the only person who could provide the required foundation. The court thus correctly found that if defendant wanted to display his tattoos in the manner defendant requested, he would have to take the stand to establish a proper foundation and be subject to cross-examination on that topic. As the majority recognizes, defendant could have established a foundation for the tattoos through another witness or through a business record, if admissible. However, that was not the issue that was presented to the trial court, and the trial court was merely required to rule on the issue that was presented to it, not to suggest every possible avenue through which defendant could establish a foundation for this evidence.

¶ 126    The majority's misidentification of the issue is further illustrated by its citation to *People v. White*, 2017 IL App (1st) 142358. Somewhat contradictorily, the majority notes that the trial court did not have the "benefit" of the *White* decision when it ruled, but also finds that the "issue in *White* [was not] the same as the one we are confronted with in this appeal." The majority is correct that the issue in this case was not before the *White* court. In *White*, the issue was whether the trial court denied defendant a meaningful opportunity to present his defense and confront the witnesses against him by being permitted to display both his arm tattoos. *Id.* ¶ 30. There was no discussion in that case of whether such a demonstration was testimonial and there was no discussion of

whether defendant presented a proper foundation. Notably, however, the majority in *White* noted that it took "no issue with the proposition that a court may limit, restrict, or deny altogether a demonstration in the appropriate circumstances. And we will defer to that ruling unless we find, as we do here, that the court abused its discretion." *White*, ¶ 37. Thus, the court in *White* recognized, unlike the majority here, that whether to permit defendant to display his tattoos is within the trial court's discretion, and that, under appropriate circumstances, the court may restrict or deny defendant an opportunity to do so.

¶ 127     In this case, there is simply no basis to find that the trial court abused its discretion where defendant failed to establish any foundation to show that he had the tattoos on the date of the offense. The court's comments do not suggest that defendant was precluded from introducing this evidence unless he waived his right to testify, but merely suggest that if defendant, personally, was going to introduce the evidence of his tattoos suggesting that he had them on the date of the offense, then defendant would be required to establish the foundation for that evidence and be subject to cross-examination for his foundational testimony. Such a ruling does not represent an abuse of discretion.

¶ 128     The majority's concludes that the court's error constituted plain error. As discussed, I do not find that the court's ruling constituted clear or obvious error,

and thus no plain error occurred. Even assuming an error occurred, however, I would not find that the evidence was closely balanced and that the error threatened to tip the scales of justice against defendant. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007) (quoting *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). At trial, the victim testified that he identified defendant by his haircut, the tattoos on his arms, and because he was able to see defendant's face from six or seven feet away on a well-lit street. When defense counsel asked the victim if he had a clear look at defendant's hands, the victim responded, "No. I was focused on the face." The victim also testified that he clearly saw a tattoo on defendant's arms of a "letter 'A' and some bunny ears."

¶ 129    The victim's girlfriend similarly testified that she was able to see the side of defendant's face as he approached the victim's van. Defense counsel questioned both witnesses regarding whether they observed any tattoos on defendant's hands, and they both testified that they did not. Thus, there were two positive identifications of defendant, and both witnesses testified that they relied on physical characteristics other than defendant's hands in identifying him, whether or not he had the hand tattoos at the time of the shooting. This evidence was sufficient to prove defendant guilty at trial, and there is no basis for finding that if defendant had been permitted to display his hand tattoos to the jury that the result would have been different. Thus, the evidence was not so

closely balanced that the evidence of defendant's hand tattoos would have tipped the scales of justice.

¶ 130    Finally, during posttrial proceedings, the trial court heard testimony from two witnesses who claimed to hear the victim saying that defendant was not the shooter and would drop the charges if he received money from the defendant's family and friends. The trial court did not just review affidavits from the potential witnesses making these claims. The trial court conducted an extensive hearing with these witnesses. The trial court did what a trial court is supposed to do.    He assessed their credibility and he found it lacking. Being in the courtroom, being able to see and hear witnesses, is solely the function of the trial court. Reading the record on appeal, does not, and cannot, give this court the ability to discern what a trial court sees and hears. That is why the trial court is given deference in making those determinations. That is why we review the court's determinations on granting a motion for new trial based upon newly discovered evidence under an abuse of discretion standard. *People v. Rudell*, 2017 IL App (1st) 152772, ¶ 38. Accordingly, I respectfully dissent and find that the trial court did not abuse its discretion in precluding defendant from displaying his hand tattoos to the jury or in denying his motion for new trial.