# Illinois Official Reports

## Appellate Court

<div style="border: 2px solid black; padding: 10px;">

## *People v. Bahena*, 2020 IL App (1st) 180197

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SERGIO BAHENA, Defendant-Appellant. |
| District & No. | First District, Fourth Division No. 1-18-0197 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-22029; the Hon. Erica L. Reddick, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Damon M. Cheronis and Ryan J. Levitt, both of Chicago, and Alfredo Acosta, of Acosta Law Group, of Maywood, for appellant. Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. Justice Reyes concurred in the judgment and opinion. Justice Lampkin specially concurred, with opinion. |

**OPINION**

¶ 1      After a bench trial, defendant Sergio Bahena, age 20, was convicted of the attempted first degree murder of Ruben Saldivar on March 9, 2013. On January 2, 2018, defendant was sentenced to 31 years with the Illinois Department of Corrections (IDOC).

¶ 2      On appeal, defendant claims that the trial court erred by denying his pretrial motions (1) to suppress a photo array and a physical lineup as unduly suggestive and (2) to quash his arrest and suppress evidence because he was arrested based on an investigative alert and without a warrant.

¶ 3      For the following reasons, we affirm.

¶ 4      BACKGROUND

¶ 5      The State's evidence at trial established that, on March 9, 2013, at 10:15 p.m., the victim drove to a liquor store in a van with Jaime Cruz and another man. While Cruz was in the store purchasing liquor, the shooter walked up to the front passenger side of the van and fired four or five shots at the victim, who was sitting in the driver's seat. Although shot, the victim managed to drive away. Later, the victim was taken to a hospital, and eventually two bullets were removed from his body, while one bullet remains near his spine. At the hospital, he spoke to detectives and provided a description of the shooter as a Latino, dark skinned, between 290 and 300 pounds, and six feet, one or two inches tall. Defendant is five feet, seven inches tall and 210 pounds.

¶ 6      Detective Terry Teahan was assigned to the case, and he created a photo array with six photos, but the victim was unable to identify the shooter from this array. Defendant's photo was not in this first photo array, which the victim viewed on March 27, 2013.

¶ 7      The police obtained a surveillance video from the liquor store that depicted the area in front of the liquor store at the time of the shooting. In the video, the liquor store is on the left, the sidewalk is in the center, and the victim's van is on the right, with the front-passenger side next to the sidewalk. The video depicts the shooter walking on the sidewalk, with his back to the camera, and stopping and facing the front passenger side of the van. As a result of the lighting, it is difficult to discern the gun or the shooting itself, although it is possible to discern flashes. The video then shows the van driving away and the shooter turning and running away. When the shooter turns, he is facing in the direction of the camera. From this video, Detective Teahan obtained a still photo of the shooter, which the detective used to create a criminal alert bulletin.

¶ 8      Sergeant Juan Perez recognized defendant from the bulletin, based on his prior contacts with defendant, and informed Detective Teahan on October 30, 2013. Detective Teahan used this information to obtain a file photo of defendant and create a second photo array with five photos. On November 4, 2013, eight months after the shooting, the victim identified defendant from the second photo array as the shooter. Based on this identification, Detective Teahan prepared an investigative alert.

¶ 9      After learning of the investigative alert, Sergeant Perez and his partner proceeded to defendant's home at 5 p.m. on November 5, 2013, knocked on the front door, and asked to speak with defendant. When defendant came to the door, Sergeant Perez asked him to step outside to the porch, and the sergeant placed defendant in custody. After his arrest, defendant made several oral statements on November 5, 2013, to the police in which he denied being the

- 2 -

shooter. Detective Teahan showed defendant a still photo of the shooter from the video, which was taken immediately after the shooter shot into the van and was cut to omit the van and the liquor store. Detective Teahan told defendant that the photo was taken in the area of the shooting, and defendant replied: "okay, that's me, that's me in the picture, but that's just me in the area. I'm not the shooter."

¶ 10   On November 5, 2013, six hours after defendant's arrest, a physical lineup was conducted, and the victim identified defendant as the shooter.

¶ 11   On November 6, 2013, defendant admitted to being the shooter, his oral statement was reduced to a typewritten statement by an assistant state's attorney, and defendant signed it. Defendant does not allege that this statement was involuntary.

¶ 12   In the typed statement, defendant states that, on the night of March 9, 2013, he was a passenger in a vehicle with three friends, whom he declined to identify, but who were all "Maniac Latin Disciples or MLD's." As they were driving, they observed the victim's van parked in front of the liquor store, and one of defendant's friends stated that the van belonged to a member of the Saints, who were "in a fight" with the MLDs. The driver of defendant's vehicle stopped the vehicle, "one of the guys" told defendant that he "needed to go shoot up the Saints," and "one of the guys" handed him a black, semiautomatic handgun. Defendant exited the vehicle, walked up to the van, and observed a person in the back of the van and another in the driver's seat. While standing in front of the front passenger door, defendant fired four to six shots into the van, at the driver. When defendant returned to his friend's vehicle, he handed the gun back to the person who had given it to him, and the driver drove away. Defendant stated that he did not know the van's driver whom he shot and that he had not observed the van or the driver prior to the night of the shooting.

¶ 13   Prior to trial, defendant filed two suppression motions that are the subject of this appeal. Defendant moved to quash his arrest and suppress evidence obtained as the fruit of the arrest, on the ground that the police arrested him based solely on an investigative alert, without an arrest or search warrant. Defendant also moved to suppress the second photo array and the lineup as unduly suggestive. After an evidentiary hearing, the trial court denied both motions, and the case proceeded to a bench trial.

¶ 14   At the bench trial, the State's witnesses testified substantially to the facts already summarized above. Defendant called Dr. Geoffrey Loftus, a psychologist whom the parties stipulated was an expert in "the field of memory and eyewitness identification," who testified regarding the dangers of relying on eyewitness identification. Defendant's brother, Alberto Bahena, age 21, testified that defendant was right-handed. The victim had testified on direct examination that he did not know in what hand the shooter held the gun but then admitted on cross-examination that he had previously told the police that the shooter held the gun in his left hand.

¶ 15   The parties stipulated that, if Officer Raul Rosales was called to testify, he would testify that, on March 9, 2013, Jaime Cruz told him that the shooter was a "a heavyset" Latino who approached the van from the passenger's side and shouted " 'what's up motherf***' " before firing five or six shots into the van. Officer Ludwig,[1] if called to testify, would testify that, on March 9, 2013, he spoke with the victim at the hospital and that the victim told him that the shooter walked toward the van "holding a handgun in his left hand"; that the shooter stared at

---

[1]The stipulation did not provide Officer Ludwig's first name.

him and then fired three times; that the shooter walked up to the passenger's side door and fired two times; that he (the victim) tried to drive away but the van was in neutral; that he was able to put the vehicle into drive and drive away; that, as he was driving away, he heard two more shots; and that the shooter was "a male Hispanic, 30 to 32 years old, 290 to 300 pounds, 6'-1 to 6'-2 feet tall, wearing a black T-shirt, black jeans, and a goatee."

¶ 16 After listening to the evidence and the arguments of counsel, the trial court found defendant guilty of aggravated battery, aggravated discharge of a firearm, and attempted first degree murder including the personal discharge of a firearm. However, the trial court found that the State had failed to prove that the victim was permanently disfigured or disabled. In finding defendant guilty, the trial court stated that it relied on "the clear evidence," including the victim's identification and testimony, which were corroborated by the surveillance video; defendant's identification of himself in a still photo taken from a video of "the actual shooting"; and defendant's uncoerced statement.

¶ 17 In his posttrial motion, defendant raised, among other things, a claim that the trial court erred by denying his pretrial motion to suppress the photo array and lineup. Defendant did not argue, in either his October 26, 2017, posttrial motion or during the January 2, 2018, argument on the posttrial motion, that the trial court erred by denying his pretrial motion to quash arrest due to lack of a warrant. On January 2, 2018, the trial court denied the posttrial motion and merged the other counts into the attempted murder court. The court observed that, for attempted murder, the sentencing range was 6 to 30 years plus a 25-year firearm enhancement. After considering factors in aggravation and mitigation, the trial court sentenced defendant to 31 years in IDOC, which the court observed was "the minimum sentence" available.

¶ 18 On January 11, 2018, defendant filed a notice of appeal, and this timely appeal followed.

¶ 19 ANALYSIS

¶ 20 I. Standard of Review

¶ 21 On appeal, defendant argues that the trial court erred in denying both of his pretrial suppression motions.

¶ 22 A trial court's ruling on a defendant's motion to suppress evidence and quash arrest usually involves questions of both fact and law. *People v. Williams*, 2016 IL App (1st) 132615, ¶ 32; *People v. McCarty*, 223 Ill. 2d 109, 148 (2006).

¶ 23 A trial court's factual findings are given great deference and will not be disturbed on review unless they are against the manifest weight of the evidence. *People v. Holmes*, 2017 IL 120407, ¶ 9; *Williams*, 2016 IL App (1st) 132615, ¶ 32; *People v. Close*, 238 Ill. 2d 497, 504 (2010). At a hearing on a motion to suppress evidence and quash arrest, the trial court acts as the fact finder and, as such, is responsible for determining the credibility of the witnesses, drawing reasonable inferences from the testimony and other evidence, and weighing the evidence presented. *Williams*, 2016 IL App (1st) 132615, ¶ 32.

¶ 24 The trial court's ultimate ruling on the motion is a question of law that we review *de novo*. *Holmes*, 2017 IL 120407, ¶ 9; *Williams*, 2016 IL App (1st) 132615, ¶ 32; *Close*, 238 Ill. 2d at 504. Thus, "[a] reviewing court *** [is] free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions." *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 72; see also *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). *De novo*

- 4 -

consideration means that a reviewing court performs the same analysis that a trial court would perform. *People v. Stephens*, 2017 IL App (1st) 151631, ¶ 48.

¶ 25 In addition, a reviewing court may affirm on any basis found in the record. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 35; *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37 ("we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct").

¶ 26 II. Forfeiture

¶ 27 Defendant claims that he preserved for our review his claims concerning the two pretrial motions, and the State does not argue otherwise.

¶ 28 Generally, to preserve an error for appellate review, a defendant must both object at trial and in a posttrial motion. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 106 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007)). As we observed above, defendant did not raise the warrantless arrest issue in his posttrial motion to the trial court.[2] Thus, this issue would ordinarily be forfeited for our review.

¶ 29 However, the State does not claim on appeal that defendant forfeited this claim by failing to raise it in the court below, and "the rules of waiver and forfeiture are also applicable to the State." *People v. Reed*, 2016 IL App (1st) 140498, ¶ 13. "The State may forfeit a claim of forfeiture by failing to raise it." *People v. Jones*, 2018 IL App (1st) 151307, ¶ 47 (finding that the State had forfeited a claim of forfeiture by failing to raise it); *People v. Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46 ("The rules of waiver also apply to the State, and where, as here, the State fails to argue that defendant has forfeited the issue, it has waived the forfeiture."); *Reed*, 2016 IL App (1st) 140498, ¶ 13 ("By failing to timely argue that a defendant has forfeited an issue, the State waives the issue of forfeiture."); see also *People v. Whitfield*, 228 Ill. 2d 502, 509 (2007) (the supreme court declined to consider the State's forfeiture argument when it was not included in the State's petition for leave to appeal). Thus, we find that the State has forfeited any claim of forfeiture with respect to the claims that defendant now raises on appeal. Ill. S. Ct. R. 341(h) (7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised *** on petition for rehearing.").

¶ 30 III. Photo Array and Lineup

¶ 31 Defendant's first claim is that the trial court erred by denying his motion to suppress the physical lineup and the second photo array on the ground that they were unduly suggestive.

¶ 32 "Criminal defendants have a due process right to be free from identification procedures that are unnecessarily suggestive and conducive to irreparable mistaken identification." (Internal quotation marks omitted.) *People v. Jones*, 2017 IL App (1st) 143766, ¶ 27; see also U.S. Const., amend. XIV (due process clause). To suppress an identification, a trial court must find both "(1) that the confrontation was unduly suggestive, and (2) that the identification was not independently reliable." *People v. Lacy*, 407 Ill. App. 3d 442, 459 (2011).

---

[2]In his brief to this court, defendant cites only his pretrial motion and the pretrial argument on the motion in support of his claim that this issue was preserved for our review. He does not cite his posttrial motion.

¶ 33    Usually, a ruling on a motion to suppress an identification involves a two-part inquiry. *People v. Rodriguez*, 387 Ill. App. 3d 812, 829 (2008). First, the defendant has the burden of proving that the pretrial identification was so unnecessarily suggestive and conducive to irreparable misidentification that he was denied due process of law. *Rodriguez*, 387 Ill. App. 3d at 829; see also *People v. Brooks*, 187 Ill. 2d 91, 126 (1999); *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 236. Second, if the defendant establishes that the identification was unduly suggestive, then the burden of proof switches to the State to make "a clear and convincing showing, based on the totality of the surrounding circumstances, that 'the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime.' " *People v. McTush*, 81 Ill. 2d 513, 520 (1980) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 122 (1977) (Marshall, J., dissenting, joined by Brennan, J.)); see also *Rodriguez*, 387 Ill. App. 3d at 829. In other words, the State must then show that the identification is " 'independently reliable.' " *Rodriguez*, 387 Ill. App. 3d at 829 (quoting *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003)).

¶ 34    Normally, to assess whether an identification is independently reliable, Illinois courts consider the five factors set forth in the United States Supreme Court case of *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972): (1) the witness's opportunity to view the defendant during the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any prior description by the witness, (4) the witness's level of certainty at the identification, and (5) the length of time between the crime and the identification. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 54; *People v. Green*, 2017 IL App (1st) 152513, ¶ 108. A court takes all five factors into consideration, as well as the circumstances. *Colon*, 2018 IL App (1st) 160120, ¶ 54; *Biggers*, 409 U.S. at 198-200.

¶ 35    Defendant claims that the photo array was unduly suggestive because (1) it had five photos instead of six, (2) none of the five resembled the description initially provided by the victim, (3) defendant's photo occupied "a central position," (4) his photo had a blue background, (5) his photo was cropped higher on his body, thus obscuring his full body, (6) he was the only person wearing "a graphic t-shirt," and (7) his photo was "zoomed in on to a greater degree."

¶ 36    For the following reasons, we do not find these claims persuasive. First, as defendant acknowledges, there was no law at the time requiring six photos in an array. Effective January 1, 2015, section 107A-2(f) of the Code of Criminal Procedure of 1963 provided that "[a]t least 5 fillers shall be included in a photo lineup, in addition to the suspected perpetrator." 725 ILCS 5/107A-2(f)(3)(C) (West 2016). However, this statute did not invalidate prior photo arrays with fewer fillers, and defendant does not argue that it did.[3] *People v. Moore*, 2015 IL App (1st) 141451, ¶ 21 ("the newly enacted section that [the defendant] relies on became effective on January 1, 2015, and does not govern the lineup proceedings in his case"). Second, the fillers were chosen to resemble defendant, and they do. Third, two of the photos occupy a central position. The array had three photos in the first row with defendant's photo in the center, and only two photos in the bottom row. In the bottom row, one photo is on the left, and the second photo is in the center, directly under defendant's photo. Thus, there were two photos occupying a central position.

¶ 37    Fourth, at trial, the victim was asked on cross-examination what the differences were among the photos, and he replied: "they have different colors." When asked how "the picture

_____

[3]Defendant's appellate brief acknowledges "it is true enough that this statute was still proceeding through the legislative process at the time of these identifications."

- 6 -

that you marked" was "framed differently," he responded: "that one's blue." In the photo array, the background color of defendant's photo was a neutral blue-grey. The backgrounds of all the photos were in neutral, institutional colors, such as beige and grey, and each one was slightly different. Thus, the background color of defendant's photo is not unduly suggestive. Fifth, the full body is not depicted in any of the photos. All the photos are cropped to show only the head and a portion of the shoulders and chest. While defendant's photo displays slightly less of his body than the others, it is not particularly distinctive on this basis.

¶ 38       Sixth, defendant is not the only person in a graphic T-shirt. A graphic T-shirt is a T-shirt bearing a design, image, or lettering on it. What Is a Graphic T-shirt?, Quora.com, https://quora.com (last visited Mar. 25, 2020) [https://perma.cc/JG8N-F6LD]. Defendant is wearing a white T-shirt with a portion of a drawing visible in the photo. Of the other four men in the array, two are wearing black T-shirts, and one is in a polo shirt with blue horizontal stripes. However, the man immediately to the left of defendant is wearing, like defendant, a white graphic T-shirt. This man's graphic T-shirt displays the hear-no-evil, see-no-evil, speak-no-evil monkeys and states, "every man lives by a code, every man dies by a code." Thus, defendant is not the only person in a graphic T-shirt, he is not in the most distinctive shirt, and he is not in a black T-shirt, which the victim described the shooter as wearing. Seventh, defendant's face appears somewhat larger than the other faces, as though the camera was slightly closer to defendant when the photo was taken. However, the difference is not significant, particularly between defendant's photo and the photo directly under his in the array.

¶ 39       For all these reasons, we do not find persuasive defendant's claims that the photo array was unduly suggestive.

¶ 40       Defendant claims that the lineup was unduly suggestive because (1) defendant was the only person in the photo array who also appeared in the lineup, (2) the lineup was administered by the same officers who believed they had just identified the shooter, (3) one of the fillers wore "a white-striped coat with red trimming," (4) defendant was "the only individual wearing a distinctive, camouflage hoodie," (5) defendant is the only person with a water bottle and a Cheetos bag in front of him, (6) defendant's shoes had "flapping tongues" without laces, and (7) defendant does not appear to be wearing a T-shirt under his hoodie.

¶ 41       First, "[l]ineups are not rendered inadequate *** merely because the defendant is the only individual in the lineup who was also in the photographs. [Citation.] Some element of suggestiveness *** must still be shown." *People v. Johnson*, 149 Ill. 2d 118, 148 (1992).

¶ 42       For example, in *People v. Gonzalez*, 2018 IL App (1st) 152242, ¶ 96, this court reversed the defendant's conviction, with the lead opinion noting that, "[s]ince the police told the witnesses that they had found 'the shooter' and since defendant was the only person in both the photo array and the lineup, the only person who could have possibly been 'the shooter,' according to the police, was defendant, who was the only person to appear in both displays."

¶ 43       However, *Gonzalez* is distinguishable from the case at bar. In *Gonzalez*, "[b]oth eyewitnesses testified at trial that, prior to their initial identification from the photo array, the police told them (1) that the police had found the shooter and (2) that his photo was in the photo array." *Gonzalez*, 2018 IL App (1st) 152242, ¶ 95. This court found that this error by the police was "compounded" when the defendant was then the only person to appear in both the lineup and the photo array. *Gonzalez*, 2018 IL App (1st) 152242, ¶ 96.

¶ 44    By contrast, in the case at bar, there was no evidence that the police told the victim that they had found the shooter. At the pretrial suppression hearing, Detective Teahan was specifically asked whether he ever told the victim whom to select, during either the photo array or the lineup, and whether anyone else did so in his presence, and he responded no. At the trial, the victim testified that he did not recall the conversation during the photo array, and he was not asked about a conversation with respect to the lineup. Thus, *Gonzalez* is inapposite, since there was no evidence in the case at bar that the police informed the victim that the shooter had been found.

¶ 45    Second, although the lineup was administered by the investigating officers, there was no evidence that they suggested a selection. In addition, the victim refused to make an identification from the first array that the police had showed him.

¶ 46    Third, defendant claims that the man in the middle of the lineup is wearing "a white-striped coat with red trimming," making it sound like a Santa outfit. Actually, the coat has a black and white, criss-cross pattern, with red cuffs and collar. While it is more distinctive than the clothes of the other men, it is not as eye-popping as defendant alleges. Fourth, defendant claims that he is the only one in "a distinctive, camouflage hoodie." However, as defendant notes, the man in the middle has a more distinctive jacket than defendant does. In addition, four of the five men in the lineup are wearing hoodies. Of the four, one has a grey hoodie, one has a black hoodie that says "Nike Air," one has a black hoodie that says "Puma," and defendant has a black and grey camouflage hoodie. Thus, defendant's clothes are not the most distinctive.

¶ 47    Fifth, defendant is not the only person in the lineup photo with a water bottle. The man seated in the second-from-the-left position has a water bottle in his hands. In addition, Detective Teahan testified at the suppression hearing that the water bottles and snacks were not present during the identification process and that defendant and others were allowed to retrieve them later when the photo was taken.

¶ 48    Sixth, defendant claims that the lineup photo shows that defendant's shoes have "flapping tongues on his shoes missing their laces." The photo shows that four of the men, including defendant, are wearing black and white shoes and that the fifth man's shoes are grey. Laces are not visible on any of the shoes. Seventh, defendant argues that defendant "does not appear to have a t-shirt on underneath his temporary hoodie *** a fact[ ] strongly indicative of his recent arrest." However, it is unclear from the photo whether the black material appearing underneath defendant's hoodie is a shirt or only the lining of the hoodie itself.

¶ 49    To the extent that defendant is arguing that certain facts would tip off the viewer as to which person in the lineup was in custody, Detective Teahan testified at the pretrial suppression hearing that all the men placed in the lineup were in police custody at the time.

¶ 50    For all these reasons, we do not find persuasive defendant's claims that the lineup was unduly suggestive.

¶ 51    The trial court stated that it looked at both identifications "to see, were there other factors that focused the attention on the Defendant, *** versus the other individuals depicted," and concluded: "I cannot find that the procedure, the process, was unduly suggestive." We affirm the trial court's finding and its denial of defendant's motion to suppress the photo array and the lineup.

¶ 52                                    IV. Investigative Alert

¶ 53      Next defendant claims that the trial court erred by denying his motion to quash his warrantless arrest.[4]

¶ 54      Both the Illinois Constitution and the fourth amendment of the United States Constitution protect citizens from unreasonable searches and seizures by police officers. *Holmes*, 2017 IL 120407, ¶ 25; U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Article I, section 6, of the Illinois Constitution provides, in relevant part: "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures ***. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6. Similarly, the fourth amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

¶ 55      With respect to article I, section 6, of the Illinois Constitution, the Illinois Supreme Court has stated: "we follow decisions of the United States Supreme Court regarding searches and seizures." *Holmes*, 2017 IL 120407, ¶ 25. "[T]he 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials," such as police officers. *People v. Jones*, 215 Ill. 2d 261, 269 (2005).

¶ 56      Encounters between police officers and citizens have been divided by the courts into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, commonly referred to as "*Terry* stops," which must be supported by a police officer's reasonable, articulable suspicion of criminal activity (see *Terry v. Ohio*, 392 U.S. 1 (1968)); and (3) consensual encounters that involve no coercion by the police and, thus, do not implicate the fourth amendment. *Williams*, 2016 IL App (1st) 132615, ¶ 34; *Ciborowski*, 2016 IL App (1st) 143352, ¶ 77; see also *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006). In the case at bar, there is no dispute that what transpired here was an arrest requiring probable cause.

¶ 57      "[P]robable cause exists when the facts known to the officer at the time are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime, based on the totality of the circumstances." *People v. Gocmen*, 2018 IL 122388, ¶ 19. The issue is "the probability of criminal activity, not proof beyond a reasonable doubt or even that it be more likely than not." *Gocmen*, 2018 IL 122388, ¶ 19.

¶ 58      Defendant raises a purely legal question regarding his arrest, namely, whether an investigative alert that is supported by probable cause may serve as the basis for an arrest, if the police do not obtain a warrant. Defendant did not argue in the court below[5] or before this court that the officers lacked probable cause to arrest him. Defendant argues that Perez's

---

[4]As the State observes, although the record does not include the transcript of the trial court's ruling on this motion, its absence does not adversely affect our review since defendant raises a purely legal issue. A half-sheet, dated August 16, 2016, indicates that defendant's motion to quash arrest was denied.

[5]At the pretrial suppression hearing before the trial court, defense counsel argued: "Judge, I did not say that there was no probable cause. What I'm saying is that there was no search warrant, there was no arrest warrant. That's what the constitution mandates."

"authority" to arrest defendant "derived entirely from the investigative alert," and he claims that the alert, by itself, was insufficient.

¶ 59     In support, defendant relies almost exclusively on *People v. Bass*, 2019 IL App (1st) 160640, where a different division of this court held just that. In *Bass*, as in our case, the defendant did not argue a lack of probable cause for his arrest. *Bass*, 2019 IL App (1st) 160640, ¶¶ 36-37. As a result, the *Bass* court found that "his warrantless arrest did not violate the fourth amendment to the United States Constitution." *Bass*, 2019 IL App (1st) 160640, ¶ 37.

¶ 60     However, the First Division in *Bass* found that its inquiry did not stop there and that, while the arrest did not violate the United States Constitution, it did violate the Illinois Constitution. *Bass*, 2019 IL App (1st) 160640, ¶ 43. Finding that the Illinois Constitution's search and seizure protections were not in strict lockstep with the fourth amendment of the United States Constitution (*Bass*, 2019 IL App (1st) 160640, ¶¶ 40, 48, 62), the *Bass* court ruled:

>      "we find, with regard to the necessity of a warrant issued by a neutral magistrate, historical precedent concludes that article I, section 6, provides greater protections than the fourth amendment. Indeed, arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution." *Bass*, 2019 IL App (1st) 160640, ¶ 43.

¶ 61     Four months after *Bass*, this division[6] explicitly rejected *Bass*, finding: "We decline to follow the reasoning or precedent of *Bass* and find that *Bass* was incorrectly decided." *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 37. We observed that *Bass* "creates the somewhat paradoxical situation where police may arrest an individual without a warrant and without an investigative alert if they have probable cause to do so, but that same arrest becomes unconstitutional if police issue an investigative alert based on the same facts that gave rise to the probable cause." *Braswell*, 2019 IL App (1st) 172810, ¶ 39; accord *Bass*, 2019 IL App (1st) 160640, ¶ 120 (Mason, J., concurring in part and dissenting in part).

¶ 62     Justice Mason explained in her partial dissent in *Bass*: "I can perceive no principled basis on which to hold that police may arrest an individual without a warrant and without an investigative alert as long as they have probable cause, but if they issue an investigative alert based on the same facts giving rise to probable cause, they have run afoul of the Illinois Constitution." *Bass*, 2019 IL App (1st) 160640, ¶ 120 (Mason, J., concurring in part and dissenting in part). As we noted in *Braswell*, 2019 IL App (1st) 172810, ¶ 39, this point went unaddressed by the *Bass* majority.

¶ 63     The majority in *Bass* acknowledged that police still have an incentive to obtain a warrant, even without the *Bass* decision, because, "when the officer acts under the cover of a warrant, the evidence the officer discovers may still be admitted even if a court eventually invalidates the warrant for lack of probable cause." *Bass*, 2019 IL App (1st) 160640, ¶ 69 (majority opinion). On this appeal, defendant asks us to reject our recent decision in *Braswell*, which we decline to do.

¶ 64     In *Braswell*, 2019 IL App 172810, ¶¶ 4, 36, the defendant was already in police custody on an unrelated matter, when he was arrested for the instant offense based on an investigative alert. By contrast, in the case at bar, defendant was at home, and the police knocked on his door. However, defendant does not argue that the result in our case should be different because

_____

[6]In *Braswell*, the panel consisted of Justices Gordon, Reyes, and Burke, whereas the panel in the instant case consists of Justices Gordon, Reyes, and Lampkin.

- 10 -

defendant was at home or that *Braswell* is distinguishable. *People v. Givens*, 237 Ill. 2d 311, 328 (2010) ("even though a reviewing court has the power to raise unbriefed issues, it should refrain from doing so when it would have the effect of transforming the court's role from that of jurist to advocate"); *Bass*, 2019 IL App (1st) 160640, ¶¶ 111, 113 (Mason, J., concurring in part and dissenting in part) (criticizing the majority for raising *sua sponte* an unargued and unbriefed constitutional issue). Rather, defendant argues solely that *Braswell* was wrongly decided, and this, we decline to find.

¶ 65                                CONCLUSION

¶ 66    For the foregoing reasons, we do not find defendant's claims persuasive, and we affirm his conviction and sentence.

¶ 67    Affirmed.

¶ 68    JUSTICE LAMPKIN, specially concurring:

¶ 69    To be perfectly clear, I concur ONLY in the judgment.