NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230035-U

NO. 4-23-0035

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 9, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| CAMERON D. BALLARD, | ) | No. 21CF862 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Frank R. Fuhr, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice DeArmond and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding (1) the evidence presented was sufficient to prove defendant was the person who fired the shot that killed the victim and (2) trial counsel did not provide ineffective assistance by not filing a motion to suppress a photo lineup identification.

¶ 2    Following a bench trial, defendant, Cameron D. Ballard, was convicted of first degree murder and sentenced to 50 years' imprisonment. Defendant appeals, arguing (1) the State failed to prove he was the person who fired the shot that killed the victim and (2) trial counsel provided ineffective assistance by not filing a motion to suppress a photo lineup identification. For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4                                   A. Charges

¶ 5    In October 2021, the State charged defendant with one count of first degree murder

(720 ILCS 5/9-1(a)(2) (West 2020)) and one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)). The charges stemmed from a September 29, 2021, shooting that resulted in the death of Christian Rex. Counsel was later appointed to represent defendant against these charges.

¶ 6                                        B. Bench Trial

¶ 7        In October 2022, the trial court conducted a three-day bench trial. The following is gleaned from the evidence presented.

¶ 8        On the afternoon of September 29, 2021, an informal gathering of family and friends occurred at a residential property in East Moline, Illinois. The property's residents included Dolphus Patterson, two of Dolphus's daughters, Aretha and April Patterson, and one of Dolphus's granddaughters, Shanice Morrow. Included amongst those in attendance at the gathering were Kimberly Patterson, the mother of Shanice, Timothy Matthews, the brother of Shanice and friend of defendant, and defendant. Both Shanice and Timothy referred to defendant as their cousin. The guests at the gathering consumed alcohol and cannabis.

¶ 9        Around 4 p.m., several attendees, including Timothy, Shanice, and defendant, left the gathering and went to a nearby gas station. Surveillance footage from the gas station showed defendant wearing long blue shorts, a black T-shirt, and what appeared to be a white T-shirt wrapped around his head as a face mask. Defendant also had on white socks and flip-flops. Surveillance footage from the gas station showed Timothy wearing blue jeans, a white T-shirt, and tennis shoes. Both Shanice and Timothy testified defendant did not return with them to the gathering after leaving the gas station. Surveillance footage from a home near the gathering showed defendant walking alone towards the gathering after being at the gas station. Shanice acknowledged later seeing defendant again at the gathering.

¶ 10        Around 5 p.m., LaCaela Williams and her boyfriend, Christian Rex, drove to the

residential property in East Moline to visit with Aretha, whom LaCaela described as both an aunt and a cousin. At the time, LaCaela was seven months pregnant with Christian's child. LaCaela and Christian approached the property in LaCaela's vehicle through a back alley. LaCaela was driving, and Christian was seated in the front passenger seat. The windows of the vehicle were down. LaCaela testified she spoke with Dolphus, who indicated she could not park behind the property. Moments later, Kimberly, Timothy, and Shanice approached in a vehicle. LaCaela described Kimberly and Timothy as her cousins. Kimberly was driving the vehicle, Shanice was seated in the front passenger seat, and Timothy was seated in the back seat. According to LaCaela, Shanice began yelling at her. Shanice testified she addressed LaCaela only after LaCaela began yelling at Kimberly. LaCaela and Shanice exited their respective vehicles and confronted each other outside the driver's side of LaCaela's vehicle. Shanice testified she noticed Christian had a gun on his lap when she was approaching LaCaela's vehicle. Kimberly and Timothy went to the driver's side of LaCaela's vehicle to split up LaCaela and Shanice. LaCaela, Shanice, and Timothy testified they and Kimberly remained on the driver's side of LaCaela's vehicle throughout the confrontation.

¶ 11 At some point during the confrontation, LaCaela's attention was drawn elsewhere. She heard someone yelling and, after turning around, saw defendant "all the way back by the house." LaCaela did not know defendant's name at the time. LaCaela testified she and defendant "were on two different levels." She "was familiar with [defendant], [n]ot socially, just somebody who is always around because they have no place to go." She later described defendant as a "regular bum" and a "leech," who "hangs around Aretha's house drinking, smoking." LaCaela testified she also knew of defendant's brother. LaCaela acknowledged she had never invited defendant to her home. She also acknowledged she had never given him her address or asked somebody else to do so.

¶ 12        LaCaela testified defendant was "raising something" when he was yelling. It appeared to LaCaela to be a gun in a plastic bag. She explained, "It looked like what I—it was in like a bag, but the way the bag was formed it kind of looked like a short, rectangle with like a long type of clip." LaCaela told law enforcement the gun "looked like an Uzi or something." LaCaela testified defendant became "a nonrelevant factor;" he "wasn't in the actual confrontation that was going on, so I didn't pay any more mind to him."

¶ 13        At another point during the confrontation, a cup of ice left LaCaela's hand. LaCaela testified Shanice "smacked" the cup out of her hand, while Shanice and Timothy testified LaCaela threw the cup at Shanice. LaCaela testified Kimberly succeeded in getting Shanice to back away from LaCaela, which resulted in Timothy standing closest to her.

¶ 14        Christian, at some point, exited LaCaela's vehicle. After doing so, he proceeded to the front of LaCaela's vehicle, where, according to LaCaela, he and Timothy were yelling at each other. LaCaela testified Timothy was yelling at Christian that "he's an outsider and stuff," to which she responded Christian was "the father of my kid, so we are all family[,] and this is just too much." While Timothy was yelling at Christian, LaCaela noticed Timothy had his hand on a gun in his pocket. She never saw Timothy, who remained near her, remove the gun from his pocket. Both Shanice and Timothy testified Christian was brandishing a gun and yelling that nobody was going to "touch my baby mama." Timothy testified Christian kept his gun directed towards his own chest. LaCaela testified she did not see Christian with a gun or "doing a lot of bodily motions," just "yelling because he was mad at that fact that, you know, everybody was over there and I'm seven months pregnant at the time with his child." Timothy testified he did not realize Christian had a gun until Kimberly said something. LaCaela testified Kimberly yelled out, " 'He has a banger, he has a banger.' " Shanice then, according to LaCaela, screamed to defendant, " 'Come blow his ass

- 4 -

down, cuz, come blow his ass down.' " Shanice acknowledged defendant was near the rear of LaCaela's vehicle at some point during the confrontation.

¶ 15　　　　LaCaela testified, "The next time I saw [defendant] is when I am getting in the car after Christian is in the car and I hear shots." LaCaela clarified she "hear[d] a shot," followed by Christian stating, " 'Come on, Baby, he shot me, he shot me.' " At that point, LaCaela looked over and saw defendant flee from the passenger side of her vehicle. LaCaela did not see anybody else near Christian. Timothy and the others who were near the driver's side of LaCaela's vehicle also fled after the shot. Both Shanice and Timothy testified they did not see who fired the shot. LaCaela identified defendant in court as the person who shot Christian. LaCaela acknowledged she did not see defendant fire the shot. On a diagram, LaCaela identified the locations of defendant and others in relation to her vehicle.

¶ 16　　　　After the shooting, LaCaela and Christian sped away in LaCaela's vehicle. At about 6:20 p.m., they encountered a police officer, Officer Thomas Walter. After a brief traffic stop, Officer Walter followed LaCaela and Christian to a nearby hospital. Officer Walter described LaCaela as hysterical. Upon arriving at the hospital, Officer Walter assisted LaCaela with removing Christian, who was unconscious, from LaCaela's vehicle. When doing so, Officer Walter observed a handgun next to Christian, which Officer Walter secured. Officer Walter spoke with LaCaela, but LaCaela was uncooperative. Officer Walter described LaCaela as "[s]till hysterical, crying, wasn't sure what to do." LaCaela acknowledged telling Officer Walter that she "didn't see what happened." LaCaela testified she was too worried about the status of Christian to speak with law enforcement. LaCaela's vehicle was secured for inspection.

¶ 17　　　　While at the hospital, LaCaela called her mother, LaTayna Morris, who then came to the hospital. LaTayna described her daughter as hysterical. LaTayna explained she repeatedly

told LaCaela to calm down so she could understand her. LaCaela testified she told her mother "a little bit of what happened," not "everything." LaTayna testified LaCaela "told me everything that had happened that led up to the shooting and everything." When asked if she told her mother that Timothy shot Christian, LaCaela testified she did not. To the extent her mother indicated otherwise, LaCaela believed LaTayna "was confused by the words I was speaking to her." LaTayna testified LaCaela did not tell her that Timothy shot Christian. LaTayna later acknowledged having reported to law enforcement that LaCaela "said it was TJ [(Timothy)]." LaTayna explained:

> "Well, like I said, that night, you know, she was just so frantic when she was telling me about the story and stuff, but she was just like, 'It wasn't TJ.' Because I was like, 'It was TJ?' 'No, Mom, it wasn't TJ.' It was this dude that was with him."

¶ 18        At another point while at the hospital, LaCaela was approached by Detective John VanHyning. LaCaela, who still did not know Christian's status, was largely uncooperative. LaCaela testified she was too worried about Christian to cooperate. LaCaela told the detective that she could not tell him who shot Christian because she was afraid and "[t]hey know where I live." LaCaela acknowledged defendant did not know where she lived but indicated it was "a small town" and "not really hard for you to find where people live if you are looking for them." LaCaela also told the detective that it was going "to fall back on me because I was there." LaCaela did not tell the detective that she did not know defendant's name. LaCaela testified she did not convey this detail "[b]ecause I had a lot of emotions going on that night," "was seven months pregnant at the time," and "just witnessed somebody that I loved being shot." Detective VanHyning asked LaCaela for a description of the shooter. Detective VanHyning testified LaCaela described the

shooter as a light-skinned male who was larger in build. He did not recall her describing the shooter as "Mexican." LaCaela, when asked if she described the shooter as a "fat Mexican dude," indicated she "could have said [that] for [Detective VanHyning] to get out of my face" but did not recall doing so. After listening to a portion of a recording taken from Detective VanHyning's body camera, LaCaela asserted she did not describe the shooter as a "fat Mexican dude." Detective VanHyning testified LaCaela refused to return to the crime scene with him because she believed "they would know that she was in the car." Detective VanHyning also testified LaCaela indicated the shooter may be related to her, possibly a cousin. Eventually, LaCaela learned Christian had succumbed to his injuries.

¶ 19    Later that evening, LaCaela, along with her mother, went to the police station and spoke with detectives. LaCaela described her mother as her "safe zone," a person who she looked to "for guidance." LaCaela explained: "I was asking her what I should do, just wanting somebody to tell me what to do. My state of mind wasn't right." LaCaela, after speaking with her mother, decided to cooperate with law enforcement.

¶ 20    Detective Travis Staes, one of the detectives who met with LaCaela at the police station, described LaCaela as follows: "She was all over the place. She was crying. She was screaming. She was, you know, squatting down and putting her hands in her eyes, like, taking deep breaths trying to catch her breath. She was very animated." Because Detective Staes and his partner believed LaCaela "needed the emotional support," they allowed LaCaela's mother to be present during LaCaela's interview. The interview commenced approximately two hours after the shooting.

¶ 21    During the interview, LaCaela indicated she did not know the name of the person who shot Christian. She indicated the shooter was a family friend who was always around. She

described the shooter's physical appearance, specifically that he was fat and light-skinned. While both Detective Staes and LaCaela testified that LaCaela had described the shooter as light-skinned, LaCaela's mother testified LaCaela described the shooter as dark-skinned. During a photo lineup, LaCaela identified a photo of Timothy. LaCaela, when asked how she would have described Timothy if he was the shooter, testified, "I just would have said it was my cousin TJ." Detective Staes did not recall LaCaela mentioning something about a "banger."

¶ 22 During a break in the interview, when it was only LaCaela and her mother in the interview room, LaCaela and her mother discussed the identity of the shooter. LaCaela testified she

> "described what [the shooter] looked like [and] what his brother looked like to my mom at the police station[,] and she knows their mother, so she was able to pull him up on her Facebook and show me the picture and that is when I identified [defendant] as the one who shot Christian."

LaTayna testified LaCaela indicated the shooter had "the brother that walks with the limp." LaTayna also testified she talked to her sister by telephone about the description provided by LaCaela and then pulled up a photo on Facebook, which she showed to LaCaela. The photo depicted defendant.

¶ 23 After the break, Detective Staes presented LaCaela with another photo lineup. In the lineup, LaCaela identified a photo of defendant as the shooter. Detective Staes testified he did not learn of the interaction between LaCaela and LaCaela's mother until he was reviewing video footage of the interview. Detective Staes acknowledged seeing a person's photo before a photo lineup could taint the photo lineup process. He also acknowledged he had never allowed someone

to view a photo prior to a photo lineup.

¶ 24　　　　LaCaela acknowledged telling law enforcement that defendant must have had a second gun because she heard only one shot and believed the weapon defendant possessed fired multiple shots at a time.

¶ 25　　　　Law enforcement, with the assistance of a K-9 unit, investigated the scene of the shooting on the evening of September 29, 2021. No evidence of the shooting, such as a cartridge case, was discovered.

¶ 26　　　　On October 1, 2021, LaCaela appeared for a second interview at the police station. During the interview, LaCaela provided a description of the clothing worn by the shooter. She indicated the shooter was wearing blue jeans, a white T-shirt, and "Tims," a boot-type shoe. LaCaela testified she meant jean shorts and not jean pants when she provided the description. LaCaela also testified she would recognize defendant regardless of his clothing. She testified he was larger, light-skinned, and had what she described as "hamburger hair" and "a mark on his face." She acknowledged she had not previously provided the latter details.

¶ 27　　　　Dr. Mark Peters, a qualified expert in forensic pathology, performed an autopsy of Christian's body. Dr. Peters discovered a single gunshot entrance wound on the right side of Christian's back. The wound had a one-and-a-half-inch area of surrounding gun powder stippling. Dr. Peters testified the stippling was indicative of a firearm having been discharged within close range. The bullet tracked back to front and right to left. Specifically, it "enters right chest through right posterior rib 8, perforates the lower lobe of right lung, thoracic vertebra T11 with laceration of spinal cord and aorta, and penetrates lower lobe of left lung." Multiple copper and lead fragments were recovered from inside the body. Dr. Peters attributed Christian's death to a gunshot wound of the back involving the chest. Dr. Peters did not have an opinion as to the angle of the

firearm at the time of the shooting.

¶ 28     Curt Dykstra, a crime scene investigator, processed LaCaela's vehicle. Dykstra discovered blood on the front passenger seat. He did not discover blood on the outside of the vehicle. Dykstra also discovered a spent .223-caliber cartridge case near the front passenger seat. Dykstra, on cross-examination, testified the cartridge case could have been used in "a handgun or a rifle." He also testified the case typically used intact as opposed to fragmented rounds.

¶ 29     Michael Griffin, a detective of 16 years who had investigated or handled approximately 500 to 700 firearms over the course of his career, identified the gun found in LaCaela's vehicle as a 9-millimeter handgun. Detective Griffin testified the 9-millimeter handgun could not have used the .223 cartridge case found in LaCaela's vehicle. Detective Griffin indicated the .223 cartridge case would be used with "[a]n AR platform style weapon, a .223, either an AR pistol or an AR rifle." He described an "AR pistol" as "a short-barreled rifle."

¶ 30     On November 26, 2021, defendant placed a phone call from the county jail. During the call, defendant states he (1) was going to tell the truth and hope for "some type of leniency," (2) was "kind of hazy and shit because I was fucked up," and (3) does not want to look like a "rat" and all he "ever heard was snitches get stitches." Defendant also indicated, in response to statements made by the other person on the phone call, he was defending himself and was not a stone-cold killer.

¶ 31     The investigation into the shooting also uncovered the following: (1) a person whose identity could not be confirmed by law enforcement was seen walking towards the gathering shortly before the shooting, (2) a fingerprint lifted from the magazine of the handgun discovered in LaCaela's vehicle matched a fingerprint of Christian, (3) Christian had in his possession a digital scale, empty plastic baggies, and 22 grams of a controlled substance or a look-alike substance,

(4) Christian had tetrahydrocannabinol and benzoylecgonine in his system, and (5) a cell phone associated with defendant had no evidence implicating him in the shooting.

¶ 32        The trial court, after its consideration of the evidence and the closing arguments, found the State had proven defendant guilty of both first degree murder and aggravated discharge of a firearm. The court specifically stated:

> "I've considered the evidence and exhibits that have been introduced into evidence through the last three days, and I've considered the arguments of counsel. There is no doubt that someone shot and killed Christian Rex on September [29], 2021. A single shot was fired according to the testimony. A single bullet casing was found inside the car where Mr. Rex was shot. A K-9 [unit] searched the area. There were no other bullet casings found either in the car or the vicinity.
>
> The only person placed on the passenger's side of that car is [defendant]. Placed close enough that discharge of a firearm left 1-1/2 inch stippling marks on the skin of the decedent through his T-shirt. [Dr. Peters] testified that was close range. I would say that was extremely close range. [Defendant], it's my conclusion that the State has proven their case beyond a reasonable doubt, and I find you guilty of both counts."

¶ 33                    C. Posttrial Proceedings

¶ 34        In November 2022, defendant filed a motion for a new trial, arguing, amongst other things, the State failed to prove he was the person who fired the shot that killed Christian. At a

December 2022 hearing, the trial court denied defendant's motion, merged its findings of guilt, and sentenced defendant to 50 years' imprisonment. Defendant later filed a motion to reconsider his sentence and a renewed motion for a new trial, both of which the court denied.

¶ 35        This appeal followed.

¶ 36                                II. ANALYSIS

¶ 37        On appeal, defendant argues (1) the State failed to prove he was the person who fired the shot that killed Christian and (2) trial counsel provided ineffective assistance by not filing a motion to suppress the photo lineup identification. The State disagrees with each of defendant's arguments.

¶ 38                A. Challenge to the Sufficiency of the Evidence

¶ 39        Defendant argues the State failed to prove he was the person who fired the shot that killed Christian. Specifically, defendant asserts LaCaela's unreliable identification of him as the possible shooter is, without more, insufficient evidence to prove beyond a reasonable doubt he was the shooter.

¶ 40        When presented with a challenge to the sufficiency of the evidence, the question for this court is "whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Brand*, 2021 IL 125945, ¶ 58, 190 N.E.3d 149. "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876.

¶ 41        "The prosecution has the burden of proving beyond reasonable doubt the identity of the person who committed the crime." *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317,

319 (1989). The offender's identity may be established by testimony of a single eyewitness, so long as the witness viewed the accused under circumstances permitting a positive identification. *Id*. at 307. The offender's identity may also be established by circumstantial evidence, so long as it leads to "a reasonable and moral certainty that the accused and no one else committed the crime." (Internal quotation marks omitted.) *People v. Fletcher*, 72 Ill. 2d 66, 71, 377 N.E.2d 809, 812 (1978).

¶ 42       In this case, the trial court, in support of its determination that defendant was the person who fired the shot that killed Christian, found defendant was the only person placed on the passenger's side of LaCaela's vehicle. That is, the court found LaCaela's identification of defendant as the person she saw on the passenger's side of her vehicle immediately after the shooting was reliable. Defendant, on appeal, challenges this finding.

¶ 43       As an initial matter, defendant invites this court to view the State's argument concerning the reliability of LaCaela's identification as forfeited. We decline defendant's invitation. Contrary to defendant's assertion, we find the State sufficiently addressed the reliability of LaCaela's identification. Moreover, forfeiture is a limitation on the parties and not this court, and this court may overlook forfeiture when necessary to obtain a just result. *People v. Raney*, 2014 IL App (4th) 130551, ¶ 33, 8 N.E.3d 633.

¶ 44       The trier of fact is responsible for assessing the reliability of identification evidence in light of all the facts and circumstances, including (1) the witness's opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any previous description of the offender by the witness, (4) the degree of certainty shown by the witness in identifying the offender, and (5) the length of time between the offense and the identification. See *People v. Piatkowski*, 225 Ill. 2d 551, 567, 870 N.E.2d 403, 412

(2007); see also Illinois Pattern Jury Instructions, Criminal, No. 3.15 and 3.15A (approved June 28, 2017). Another consideration for the trier of fact when assessing the reliability of identification evidence is whether the witness had any acquaintance with the offender prior to the offense. *People v. McTush*, 81 Ill. 2d 513, 521, 410 N.E.2d 861, 865 (1980).

¶ 45    As to the first and second factors, defendant asserts LaCaela did not have a sufficient opportunity to view the offender and her degree of attention on the offender was compromised by the level of stress that the confrontation and shooting created. We disagree. While LaCaela was enmeshed in a heated confrontation with family members, her attention was drawn elsewhere on two different occasions. On the first occasion, LaCaela noticed defendant back by the house yelling and raising something that appeared to be a gun in a plastic bag. LaCaela's attention then returned to the confrontation—"[defendant] wasn't in the actual confrontation that was going on, so I didn't pay any more mind to him." Then, after the shooting, LaCaela's attention was again drawn to defendant. LaCaela, who was on the driver's side of her vehicle, looked over and saw defendant, alone, flee from the passenger's side of her vehicle. Under these circumstances, it could be reasonably found LaCaela had a sufficient opportunity to view the offender and her degree of attention on the offender was not compromised. See *People v. Benson*, 266 Ill. App. 3d 994, 1005, 641 N.E.2d 617, 626 (1994) ("The conditions need not be perfect and the observation need not be prolonged.").

¶ 46    With respect to the third factor, defendant asserts LaCaela's prior description of the offender weighs against reliability. We disagree. While LaTayna believed LaCaela had described the offender as dark-skinned, both LaCaela and Detective VanHyning testified LaCaela described the offender as light-skinned. LaCaela and Detective VanHyning also testified LaCaela described the offender as fat or having a larger build. These descriptions are, undisputedly, consistent with

defendant's appearance. While LaCaela provided a description of the offender's clothing which was largely inconsistent with the clothing defendant was wearing at the gas station, that description was not given until days after the shooting, and LaCaela testified she would have recognized defendant regardless of his clothing. Under these circumstances, it could be reasonably found LaCaelas's prior description of the offender weighed in favor of reliability or, alternatively, neutrally.

¶ 47　　　　As to the fourth and fifth factors, defendant asserts LaCaela's level of certainty in the identifications at the police station and in court and the length of time between the offense and the identifications were compromised by the suggestiveness of the photo lineup. We disagree. As defendant concedes, LaCaela voiced no uncertainty about her identification of the offender at the photo lineup or at trial, and the photo lineup occurred within hours of the shooting. The only uncertainty voiced by LaCaela concerned the offender's name. LaCaela indicated to law enforcement the offender was a family friend who was always around. She also provided a description of the offender's physical appearance. Under these circumstances, it could be reasonably found the level of certainty in the identifications and the length of time between the offense and the identifications were not compromised by LaCaela being shown a photo of defendant shortly before the lineup and, therefore, weighed in favor of reliability.

¶ 48　　　　Regarding whether the witness had any acquaintance with the offender prior to the offense, defendant asserts LaCaela's familiarity with him prior to the offense should be weighed neutrally. We disagree. Contrary to defendant's contention, we find LaCaela's testimony concerning her familiarity with defendant was largely consistent. LaCaela testified she "was familiar with [defendant], [n]ot socially, just somebody who is always around because they have no place to go." LaCaela testified she also knew of defendant's brother. While LaCaela did not

initially know defendant's name, she had a sufficient degree of familiarity with him by which she could later identify him. Under these circumstances, it could be reasonably found LaCaela's acquaintance with the offender prior to the offense weighed in favor of reliability.

¶ 49    After reviewing all the facts and circumstances surrounding the identification evidence in this case, we find the trial court, as the trier of fact, could reasonably find LaCaela's identification of defendant as the person she saw on the passenger's side of her vehicle immediately after the shooting was reliable.

¶ 50    The trial court also, in support of its determination that defendant was the person who fired the shot that killed Christian, found Christian was shot within close range. The evidence supports the court's finding. See *People v. Swenson*, 2020 IL 124688, ¶ 36, 181 N.E.3d 116 ("The trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence."). As the court highlighted, the gunshot wound to Christian's back had a one-and-a-half-inch area of surrounding stippling which, according to Dr. Peters, was indicative of a firearm having been discharged within close range. In addition, the only cartridge case found following searches of the crime scene and LaCaela's vehicle was discovered inside LaCaela's vehicle. That discovery, as the court highlighted, provided further support for its finding that Christian was shot within close range, even if the firearm which discharged the bullet was never recovered.

¶ 51    Finally, we find additional evidence not explicitly addressed by the trial court supports its determination that defendant was the person who fired the shot that killed Christian. See *People v. Curtis*, 296 Ill. App. 3d 991, 1000, 696 N.E.2d 372, 379 (1998) ("If the record contains facts which support an affirmance of the trial court's finding, the reviewing court may take those facts into account even if the trial court did not state it explicitly relied upon them.").

First and foremost, we find the statements made during the phone call from the county jail implicate defendant in the shooting. Furthermore, we find Shanice's identification of defendant as being near the rear of LaCaela's vehicle during the confrontation provides support for LaCaela's identification of defendant as being near the passenger's side of her vehicle immediately after the shooting.

¶ 52       In sum, we find the circumstantial evidence presented in this case is such that it can be reasonably concluded beyond a reasonable doubt that defendant was the person who fired the shot that killed Christian.

¶ 53                    B. Challenge to the Performance of Trial Counsel

¶ 54       Defendant argues trial counsel provided ineffective assistance by not filing a motion to suppress the photo lineup identification. Specifically, defendant asserts counsel should have sought to suppress the photo lineup identification on the basis the lineup procedure was unnecessarily suggestive and the identification was not otherwise reliable.

¶ 55       "Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois." *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767. Claims of ineffective assistance of counsel are analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Domagala*, 2013 IL 113688, ¶ 36. To prevail on a claim of ineffective assistance, a defendant must show both: (1) "counsel's performance was objectively unreasonable under prevailing professional norms" and (2) "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

¶ 56 Where a claim of ineffective assistance is based on a failure to file a motion to suppress, the defendant, in order to establish the requisite prejudice, "must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15, 989 N.E.2d 192. In this case, defendant has not demonstrated the unargued suppression motion would have been meritorious.

¶ 57 "Criminal defendants have a due process right to be free from identification procedures that are unnecessarily suggestive and conducive to irreparable mistaken identification." (Internal quotation marks omitted.) *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 32, 170 N.E.3d 1014. "Illinois courts use a two-part test to determine whether an identification procedure comports with due process." *People v. Jones*, 2017 IL App (1st) 143766, ¶ 28, 81 N.E.3d 48. First, the defendant must show the identification procedure used was unnecessarily suggestive. *Id.* Second, if the defendant makes such a showing, the burden shifts to the State to demonstrate the identification is otherwise reliable. *Id.* With respect to the first part of the test, due process requires suppression of an identification only where the suggestive circumstances of the identification procedure were the result of improper conduct by the police. *People v. Gavin*, 2022 IL App (4th) 200314, ¶ 55, 214 N.E.3d 250; see *Perry v. New Hampshire*, 565 U.S. 228, 245, 132 S. Ct. 716, 728 (2012) ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness.").

¶ 58 Defendant asserts the lineup procedure used in this case was unnecessarily suggestive because of LaCaela's mother showing LaCaela a picture of him moments before the lineup. The action of LaCaela's mother, however, was independent of any improper conduct by

the police. Indeed, Detective Staes testified he did not learn of the interaction between LaCaela and LaCaela's mother until he was reviewing video footage of the interview. Moreover, as previously indicated, the facts and circumstances surrounding the identification demonstrate the identification was reliable regardless of the action of LaCaela's mother. Accordingly, it would have been futile to file a motion to suppress on the basis the lineup procedure was unnecessarily suggestive and the identification was not otherwise reliable. Counsel is not ineffective for not filing a futile motion. *People v. Hartfield*, 2022 IL 126729, ¶ 38, 202 N.E.3d 890.

¶ 59        In so finding, we note defendant, for the first time in his reply brief, presents an alternative basis upon which he asserts counsel should have sought to suppress the photo lineup identification: the identification was "more prejudicial than probative." Because defendant did not raise this point in his initial brief, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Forfeiture aside, filing a motion to suppress on this basis would also have been futile given the facts and circumstances surrounding the identification demonstrate the identification was reliable regardless of the action of LaCaela's mother.

¶ 60                                III. CONCLUSION

¶ 61        For the reasons stated, we affirm the trial court's judgment.

¶ 62        Affirmed.